In the Matter of the Arbitration Between
**MARITIME INTERNATIONAL
NOMINEES ESTABLISHMENT**

v.

The REPUBLIC OF GUINEA, Appellant,

United States of America, Intervenor.

No. 81–1073.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 25, 1982.

Decided Nov. 12, 1982.

As Amended on Denial of Rehearing
Jan. 27, 1983.

Stephen N. Shulman, with whom Mark C. Ellenberg and Mary M. Kearney, Washington, D.C., were on the brief, for appellant.

David Maurice Cohen, Atty., Dept. of Justice, with whom Charles F.C. Ruff, U.S. Atty. at the time the brief was filed, William Kanter, Linda M. Cole, and James G. Hergen, Attys., Dept. of Justice, and James H. Michel and Jonathan B. Schwartz, Attys., Dept. of State, Washington, D.C., were on the brief, for intervenor.

Mattaniah Eytan, San Francisco, Cal., with whom Julius Kaplan and James W. Schroeder, Washington, D.C., were on the brief, for appellee.

Before ROBINSON, Chief Judge, EDWARDS, Circuit Judge, and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge McGOWAN.

McGOWAN, Senior Circuit Judge:

The Republic of Guinea ("Guinea") appeals from, and raises numerous challenges to, the District Court's order confirming an arbitration award rendered by the American Arbitration Association in favor of Marine International Nominees Establishment ("MINE"). The District Court lacked subject matter jurisdiction, Guinea claims, because Guinea was immune under the Foreign Sovereign Immunities Act of 1976 ("FSIA"), Pub.L. No. 94–583, 90 Stat. 2891; because the arbitration clause contained in the parties' contract precluded the exercise of jurisdiction under the FSIA; and because the FSIA does not, and cannot constitutionally be read to, confer subject matter jurisdiction over suits between foreign plaintiffs and foreign states. Guinea also contends that MINE's service of process upon it did not meet the requirements of the FSIA and that the arbitration award itself was defective and unenforceable.

We reach only the first of these arguments, because we conclude that Guinea was immune under the FSIA and therefore that the court lacked subject matter jurisdiction to confirm the award. Accordingly, we reverse.

I

The following facts, unless indicated otherwise, are not disputed by the parties. The Republic of Guinea is a foreign sovereign state, and MINE is a Liechtenstein corporation. On August 19, 1971, Guinea and MINE[1] entered into a contract providing for the creation of a "mixed economy company" that became known as "SOTRAMAR." J.A. 205–27.[2] The purpose of the contract, as seen by both MINE and Guinea, was to establish and provide shipping services to transport Guinean bauxite to foreign markets. Appellant's Br. 4–5; Appellee's Br. 4; J.A. 209. The contract detailed the obligations of the parties and included provisions concerning capital and profits, operation, management, labor, professional training, and tax treatment. One "special provision" stated that the parties would make a market study and set up a technical and economic dossier, and that "mixed technical commissions" would study such matters as organization and finances. All these studies were to take place before SOTRAMAR was formed. J.A. 225. Although Guinean law was to be "applicable" to the contract, the contract stated that the "law between the parties" was the contract itself, and therefore that "Guinean laws shall be used for the interpretation and the implementation of this Agreement only accessorily and only in the case where the Agree-

---

1. The signatories to the contract were Guinea and the Inter Maritime Bank, which acted "in the name and on behalf of" MINE. Joint Appendix ("J.A.") 207.

2. "SOTRAMAR" is an acronym for the "Societe Mixte de Transports Maritimes," Appellant's Brief ("Br.") 4, or the "Societe Guineenne de Transports Maritimes," Appellee's Br. 5.

ment would leave a problem unsolved." J.A. 222–23.

The contract also contained several provisions relating to the settlement of disputes. When disagreements arose, the parties were first to attempt informal conciliation. If that effort failed, the parties were then to submit the conflict to arbitration by means of the method described in the contract—a panel of three arbitrators "selected by the President of CIRDI at the joint request of the parties or, failing this, at the request of the most diligent party." J.A. 226. "CIRDI" is the French acronym for the International Centre for Settlement of Investment Disputes. A codicil to the contract stated that the arbitrators would be chosen by the "President of the International Court of Settlement of International Disputes [sic] in Washington (CIRDI)." J.A. 229.

Although we will discuss later the parties' disagreement over the exact meaning of these arbitration provisions, a brief description of the International Centre for Settlement of Investment Disputes ("ICSID") should be helpful at this point. ICSID was established by an international agreement, the Convention on the Settlement of Investment Disputes Between States and Nationals of Other States, Mar. 18, 1965, 17 U.S.T. 1270, T.I.A.S. No. 6090, 575 U.N.T.S. 159 ("the Convention"), to which the United States and more than seventy-five foreign countries are parties. Although ICSID is seated in Washington, D.C., its purpose is to provide an international conciliation and arbitration forum. Convention art. 1(2). An ICSID arbitration is not undertaken by ICSID itself, but by arbitral tribunals constituted in accordance with the provisions of the Convention and subject to rules promulgated by ICSID. When two eligible parties consent to submit a dispute to an ICSID arbitration, that course is deemed to be their sole remedy unless they specify otherwise. *Id.* art. 26. Following the execution of a valid consent, either party may invoke the ICSID arbitration process, even if the other party refuses to participate. *Id.* art. 36. An ICSID award, even when rendered in such a default proceeding, is final and binding on the parties. *Id.* arts. 45, 53.

Although some SOTRAMAR-related activities took place after the contract was signed, SOTRAMAR never became an operating commercial entity. A rift developed between the parties, and in January 1975 the parties signed a form purporting to present their differences to an ICSID arbitration. Appellant's Br. 7; Appellee's Br. 56–57; J.A. 46.

What took place next is disputed. By Guinea's account, MINE agreed to file with ICSID the consent and a formal arbitration request; MINE took no such action but instead determined that the consent form was technically deficient; MINE mailed a purportedly correct revised form to Guinea; Guinea never received this form; and MINE made no effort to determine whether the revised form had reached Guinea. Appellant's Br. 7. MINE states that it perceived a deficiency in the first consent form and "urged" Guinea to execute a new form, but that Guinea then "broke off all relations and refused to communicate further with MINE." Appellee's Br. 6. ICSID files contain no record of any request for arbitration in connection with the SOTRAMAR contract. J.A. 236 (letter from Acting Secretary-General of ICSID to counsel for Guinea (Dec. 8, 1980), Exhibit 7 to Guinea's Motion to Dismiss and Opposition to Motion to Confirm Arbitration Award and Enter Judgment).

On January 20, 1978—some three years after the first consent form was signed—MINE filed, in federal district court, a petition to compel arbitration under section 4 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4 (1976), asserting subject matter jurisdiction under the FSIA and the FAA. J.A. 6. In essence, section 4 of the FAA empowers a federal district court to order arbitration to proceed in accordance with the terms of an arbitration agreement when adequate findings are made that an agreement did exist and that a default under the agreement did occur. Another relevant section of the FAA, section 5, 9 U.S.C. § 5 (1976), sets forth the circumstances

when a court is additionally authorized to order arbitration before an arbitrator or arbitrators not named in the agreement. One such instance occurs when a party "fail[s] to avail himself" of the agreed-upon method for naming arbitrators. *Id.*

Drawing on these provisions, the petition to compel set forth a series of allegations, with exhibits attached, to demonstrate that the court should order the parties to proceed to arbitration before the American Arbitration Association ("AAA"). In essential part, MINE maintained that it had prepared the joint consent form "in accordance with the terms" of the SOTRAMAR contract, that it had then prepared a corrected consent form and had mailed it to Guinea, and that Guinea had "failed and refused either to sign the revised submission or to proceed with arbitration." J.A. 8–9. As a result, MINE continued, it could not initiate an ICSID arbitration. J.A. 9.

Because in MINE's view these facts demonstrated that Guinea intended not to abide by the agreed-upon arbitration method, *id.*, the petition went on to assert that no longer was that method available. *Id.* An order to compel arbitration was therefore proper, "since procedures are available [under section 5] to have a court appoint an arbitrator for the non-cooperating party." J.A. 10.

MINE served process upon Guinea by mailing, via registered mail, copies of the relevant documents to the Ministry of Foreign Affairs in Conakry, Guinea. MINE also sent the same documents by certified mail to the Embassy of Guinea in Washington, D.C. J.A. 47. Guinea did not respond to these documents.

The District Court heard argument on the petition on June 15, 1978; Guinea made no appearance. That same day, the court entered an order granting MINE's petition and ordering arbitration before the AAA and in accordance with the rules of the AAA. J.A. 48. The order set forth the court's conclusions that service had been proper under the FSIA, that the existence of an arbitration agreement and the failure to comply therewith were not in issue, and

that Guinea's failure to avail itself of the agreed-upon arbitration method had frustrated the intent of that agreement. The order did not specifically state the basis for the court's subject matter jurisdiction. The clerk of the District Court served copies of the order, by registered mail, upon the Ministry of Foreign Affairs in Guinea and upon the Embassy of Guinea in Washington, D.C. J.A. 50.

MINE then filed, on September 5, 1978, a demand for arbitration before the AAA, J.A. 102, serving notice of the demand upon Guinea by the same method it had followed earlier. J.A. 110. The demand alleged several breaches of the SOTRAMAR agreement, including Guinea's failure to give to SOTRAMAR's management the necessary authority to conclude contracts for the carriage of bauxite and the provision of services, as well as Guinea's grant to another company of the bauxite rights reserved to MINE. J.A. 105–06. Arbitration hearings took place on February 5, 6, and 7, 1979; May 25, 1979; and April 14, 1980. J.A. 95–100 (affidavit of James W. Schroeder, Exhibit C to MINE's Motion to Confirm Arbitration Award and Enter Judgment). During these proceedings, the AAA served upon Guinea various documents concerning the arbitration, *id.;* Guinea did not appear or file any response. On June 9, 1980, the arbitrators rendered an award in excess of $25 million, which primarily represented compensatory damages for breach of contract. J.A. 86–87.

MINE then returned to the District Court, filing on August 22, 1980, a motion to confirm and enter judgment on the arbitration award under section 9 of the FAA, 9 U.S.C. § 9 (1976). J.A. 51. Accompanying the motion was a memorandum of points and authorities, with exhibits attached. Once again, MINE served process upon Guinea by the method followed earlier.

On December 9, 1980, Guinea entered the proceedings for the first time, filing a motion to dismiss for lack of subject matter jurisdiction. Record ("R.") 21. Guinea also filed a memorandum of points and authorities in support of the motion to dismiss and

in opposition to MINE's motion to confirm. J.A. 125. In brief outline, the memorandum argued that neither the FAA, the commercial rules of the AAA, nor the FSIA provided the court with subject matter jurisdiction to entertain either MINE's earlier petition to compel or the motion to confirm. J.A. 134–40. The memorandum also contended that the court's earlier order to compel rested on an incorrect premise, because an ICSID arbitration had indeed been available.

MINE then filed, on January 5, 1980, a memorandum in reply to Guinea's motion to dismiss and in further support of its own motion to confirm. J.A. 237. Attached to the document were supporting exhibits.

The court heard oral argument from the parties on January 8, 1981, focusing attention on the issue of subject matter jurisdiction under the FSIA.[3] On January 12, 1981, the court entered an order denying Guinea's motion to dismiss, granting MINE's motion to confirm, and entering judgment on the award. R. 25.[4] The court also issued a four-page memorandum opinion primarily discussing its conclusion that it had subject matter jurisdiction under the FSIA. *In re Arbitration between Maritime International Nominees Establishment v. Republic of Guinea,* 505 F.Supp. 141 (D.D.C. 1981) (mem. op.) ["*MINE v. Guinea*"].

On January 16, 1981, Guinea filed a motion for a new trial or, in the alternative, for relief from judgment, on the ground that newly discovered evidence showed that MINE's service of process had been invalid under the FSIA. J.A. 305. Also on that day, Guinea moved for a stay of the judgment until the District Court had ruled on the motion for a new trial, or, in the alternative, for shortening the time for MINE to respond to Guinea's motion for a new trial. R. 28. That same day, MINE submitted an affidavit in opposition to both motions. J.A. 322.[5] On January 21, 1981, the District Court entered an order denying both of Guinea's motions but allowing Guinea five days to seek from this court a stay pending appeal. J.A. 325. Also on January 21, Guinea filed a notice of appeal from the January 12 order confirming the arbitration award.[6] The next day, Guinea moved this court for a stay pending appeal; on January 23 that motion was granted and execution of judgment was stayed until a decision on the merits or further order of the court.[7]

## II

Guinea's challenges to the confirmation order fall into three categories.[8] First, it claims that the District Court lacked subject matter jurisdiction because: (1) the court erred in ruling that Guinea was not immune under the FSIA; (2) even assuming non-immunity, the FSIA does not purport to confer subject matter jurisdiction over suits between foreign plaintiffs and foreign states; (3) the FSIA would be unconstitutional if read to confer such juris-

---

3. At the outset of the hearing, the court stated, "The issue that concerns the Court the most and the one that seems to me that you ought to focus your arguments on is, basically, the jurisdictional question." Transcript of January 8, 1981, Hearing, at 3.

4. On March 11, 1981, upon motion of both parties, the District Court corrected this with respect to the amount of the award. J.A. 297.

5. MINE sought to make a fuller reply to the contentions advanced in Guinea's motions by filing on January 23, 1981, a motion for leave to complete the record. J.A. 326. The District Court granted the motion on February 10, 1981. R. 34.

6. The same day, Guinea filed with the District Court a motion for a stay pending appeal. R. 30.

7. On September 18, 1981, this court entered an order granting the United States leave to intervene pursuant to 28 U.S.C. § 2403 (1976), and allowing the United States to file a suggestion of interest. In addition to the regular cycle of briefing in this case, therefore, we have received a Brief for the United States as Intervenor and Suggestion of Interest, and briefs from MINE and Guinea in reply to the United States's brief.

8. Although Guinea directs some of its arguments both to the order to compel and the order to confirm, *see, e.g.,* Appellant's Br. 25, it is clear that the only order on review before us is the order to confirm. An order to compel arbitration issued in an independent proceeding under the FAA is a final and appealable judgment. *See Chatham Shipping Co. v. Fertex Steamship Corp.,* 352 F.2d 291 (2d Cir.1965); 9 Moore's Federal Practice ¶ 110.20[4.–1] (2d ed. 1982). *Cf. Goodall-Sanford, Inc. v. United Textile Workers,* 353 U.S. 550, 77 S.Ct. 920, 1 L.Ed.2d 1031 (1957) (order directing arbitration under section 301(a) of the Taft-Hartley Act, 29 U.S.C. § 185(a) (1976), is appealable as a final judgment). Guinea cannot now, by way of appealing the confirmation order, obtain review of the earlier order to compel.

diction; and (4) the signing by both parties of the first ICSID consent form committed them to an ICSID arbitration and therefore deprived the District Court of jurisdiction.

Second, Guinea claims that MINE's service of process upon it was inadequate under the FSIA, and therefore that the District Court lacked personal jurisdiction under the FSIA. Third, Guinea attacks the arbitration award itself, contending (1) that the arbitrators exceeded their authority by disregarding the liquidated damages provision of the contract, (2) that the arbitrators lacked power to delegate the task of damage calculation to an accounting firm, (3) that the award was based on evidence outside the record, and (4) that MINE obtained an AAA arbitration by misrepresenting before the District Court the availability of an ICSID arbitration.

Because we hold that the court lacked subject matter jurisdiction to confirm the arbitration award, we need not address the service of process issue or the validity *vel non* of the arbitration award itself. And, because this jurisdictional holding rests on our conclusion that the condition for subject matter jurisdiction under the FSIA—non-immunity—was not met, we do not reach the second, third, or fourth of Guinea's subject matter jurisdiction arguments.[9]

### III

With the passage of the FSIA, Congress enacted a comprehensive scheme setting forth "when and how parties can maintain a lawsuit against a foreign state or its entities in the courts of the United States," and "when a foreign state is entitled to sovereign immunity." H.R.Rep. No. 94–1487, 94th Cong., 2d Sess. 6 (1976), U.S.Code Cong. & Admin.News 1976, p. 6604. The application of this scheme requires some unraveling of the Act's interlocking provisions governing the separate issues of subject matter jurisdiction, sovereign immunity, and personal jurisdiction.

Subject matter jurisdiction is addressed by section 1330(a), 28 U.S.C. § 1330(a) (1976), which creates in federal district courts

> original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement.

The Act thereby connects the issue of subject matter jurisdiction to the issue of sovereign immunity: the absence of immunity is a condition to the presence of subject matter jurisdiction.

Personal jurisdiction is governed by section 1330(b), *id.* § 1330(b):

> Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title.

In other words, a lack of subject matter jurisdiction also deprives the court of personal jurisdiction under the Act.

Whether subject matter and personal jurisdiction existed under the Act, then, turns

---

9. MINE has not argued that the District Court's finding that it had jurisdiction under the FSIA in the earlier section 4 proceeding to compel bars Guinea from questioning the District Court's exercise of jurisdiction in the section 9 proceeding to confirm now under review. Because the section 9 proceeding adjudicated a different claim from that in the earlier proceeding, any preclusive effect would derive from the doctrine of collateral estoppel, not res judicata. *See Commissioner v. Sunnen,* 333 U.S. 591, 597–98, 68 S.Ct. 715, 719–720, 92 L.Ed. 898 (1948); *Nasem v. Brown,* 595 F.2d 801, 805 n. 8 (D.C.Cir.1979). That doctrine requires that even issues less basic than jurisdiction be fully litigated before they are preclusively established. *See McCord v. Bailey,* 636 F.2d 606, 609 (D.C.Cir.1980), *cert. denied,* 451 U.S. 983, 101 S.Ct. 2314, 68 L.Ed.2d 839 (1981); 1B Moore's Federal Practice ¶ 0.443[3] (2d ed.

1982). Guinea did not appear in the first proceeding, so the issue was not fully litigated and may be raised at this time.

Moreover, we would almost certainly reach the same result were we to apply the doctrine of res judicata by somehow viewing Guinea's raising of the jurisdictional issue in the confirmation proceeding as a collateral attack on the holding of the proceeding to compel. As the Supreme Court recently reaffirmed, "A defendant is always free to ignore the judicial proceedings, risk a default judgment and then challenge that judgment on jurisdictional grounds in a collateral proceeding." *Insurance Corp. v. Compagnie des Bauxites de Guinee,* —— U.S. ——, 102 S.Ct. 2099, 2106, 72 L.Ed.2d 492 (1982). Even if this rule preserves only *personal*-jurisdiction attacks, it would preserve Guinea's immunity defense, which addresses both personal and subject matter jurisdiction.

in the first instance on whether Guinea was entitled to immunity under sections 1605 and 1607. These sections set forth the exceptions to the general principle, stated in section 1604, *id.* § 1604, that foreign states are immune from the jurisdiction of federal and state courts, subject to existing international agreements to which the United States was a party at the time of the Act's passage. Of these exceptions, only subsections (a)(1) and (a)(2) of section 1605 have possible relevance to this case; the District Court found that each supported a finding of non-immunity and, hence, of subject matter jurisdiction.

## A.

Section 1605(a)(1) states that a foreign state shall not be immune in any case in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver.

The SOTRAMAR codicil, we recall, stated that the parties would arbitrate before arbitrators selected by the "President of the International Court of Settlement of International Disputes [sic] in Washington (CIRDI)." J.A. 229.

Applying section 1605(a)(1) to the parties' agreement, the District Court began by noting that ICSID's Rules of Procedure call for ICSID tribunals to meet at the seat of ICSID—Washington, D.C.—unless another site is agreed upon by the parties and approved by ICSID. *MINE v. Guinea,* 505 F.Supp. at 143. Therefore, the court reasoned, the parties must have contemplated that arbitration would take place in the United States. Because the legislative history indicates that implicit waiver may be found "in cases where a foreign state has agreed to arbitration in another country," H.R.Rep. No. 94–1487, *supra,* at 18, the court concluded that the SOTRAMAR arbitration clause constituted such a waiver. *MINE v. Guinea,* 505 F.Supp. at 143.

Guinea challenges this conclusion on the ground that an agreement to submit future disputes to an ICSID arbitration cannot be deemed an implied waiver of immunity within the meaning of the FSIA.[10] Appellant's Br. 26–28. MINE, however, claims that we need not read the District Court as implying the proposition that Guinea attacks. According to MINE, the SOTRAMAR arbitration clause did not contemplate a formal ICSID arbitration, but merely provided for a non-ICSID arbitration to be undertaken by arbitrators chosen by ICSID's President. Appellee's Br. 23 n. 16, 56. The only question we must decide, MINE asserts, is whether the clause, when read this way, constitutes an implicit waiver of immunity.

We are bound not to disturb a factual finding of the District Court unless it is clearly erroneous. *See* Fed.R.Civ.P. 52(a). In this case, the District Court's waiver holding was unquestionably based on the factual conclusion that the parties had contemplated an ICSID arbitration. First, as stated above, a central ingredient of that holding was the ICSID procedural rule stating that ICSID arbitrations shall normally take place at ICSID's seat in Washington,

10. MINE also argues that the SOTRAMAR contract constituted an explicit waiver of immunity within the meaning of section 1605(a)(1). Appellee's Br. 19–20. MINE can point to no particular provision in the contract arguably concerning immunity; rather, MINE rests its argument on the fact that the SOTRAMAR venture was a "mixed-economy" company under the laws of Guinea. Participation in such a company amounted to an explicit waiver, in MINE's view, because Guinean law provides that the state in a mixed economy company is a shareholder and that the state's rights and obligations are derived from its standing as a shareholder rather than as a state. *Id.*

Although a state can explicitly waive its immunity in a contract with a private party, H.R. Rep. No. 94–1487, *supra,* at 18, MINE's argument falls far short of demonstrating such a waiver. This becomes clear upon reading the House Report's comments about withdrawals of waivers:

> [I]f the foreign state agrees to a waiver of sovereign immunity in a contract, that waiver may subsequently be withdrawn only in a manner consistent with the expression of the waiver in the contract. Some court decisions have allowed subsequent and unilateral rescissions of waivers by foreign states. But the better view, and the one followed in this section, is that a foreign state which has induced a private person into a contract by promising not to invoke its immunity cannot, when a dispute arises, go back on its promise and seek to revoke the waiver unilaterally.

*Id.* These statements suggest that Congress contemplated waivers of a much more specific and explicit nature than the one MINE constructs from the operation of this Guinean law.

D.C. From this rule the court inferred that the parties must have anticipated that arbitration would occur in the United States. *MINE v. Guinea,* 505 F.Supp. at 143. Obviously, the court would not have attached significance to the ICSID rules had it not understood the SOTRAMAR contract as contemplating an arbitration that would be subject to those rules—an ICSID arbitration. Second, the District Court described MINE's effort to have Guinea sign a revised submission to the jurisdiction of ICSID as an attempt to have the dispute heard "in arbitration *as contemplated by the contract." Id.* at 142 (emphasis added); *see also id.* at 142 n.2 (parties dispute whether MINE "could have proceeded to arbitration *in the manner contemplated by the contract* despite Guinea's refusal to participate [by refusing to sign the revised joint submission]") (emphasis added). Because exhibits filed by MINE itself in connection with its motion to confirm demand this very conclusion,[11] we cannot say that the District Court's factual finding was clearly erroneous.[12]

11. One exhibit, a copy of the "Demand for Arbitration" that MINE presented to the AAA, contains the following statement:

> Disputes between M.I.N.E. and Guinea arose out of and relating to the Agreement. In 1975, M.I.N.E. sought to obtain from Guinea a proper and correct joint submission of their dispute to ICSID. Guinea, however, failed and refused to sign such a submission or to proceed with arbitration. The refusal by Guinea to execute a revised joint submission or otherwise cooperate with M.I.N.E.'s efforts made unavailable the method originally agreed upon by the parties for choosing arbitrators.

J.A. 103. A reference in another exhibit echoes the allegation that the failure to sign a submission to ICSID frustrated the method "originally agreed upon by the parties." J.A. 93 (affidavit of MINE's then-attorney). The clear import of these statements is that the parties contemplated an ICSID arbitration.

12. We find an alternative reason to reject MINE's contention that the parties contemplated a non-ICSID arbitration in the fact that MINE consistently seems to have urged a contrary version of events on the District Court. Establishing the proper context for an understanding of how MINE's position changed on appeal requires us to elaborate a few important details. As noted earlier, the contract contained a clause calling for arbitration of disputes by a panel of three arbitrators selected by the President of ICSID. J.A. 226; *id.* 229 (codicil). By its terms alone, this arbitration clause is indeed consistent with the argument MINE now offers for the first time on appeal: that the parties did not intent ICSID to conduct a formal arbitration, but only to have a hand in the selection of arbitrators. The language of the contract, however, is not the only evidence presented that was relevant to the parties' intended agreement to arbitrate. To begin with, the parties' subsequent conduct bears out that they had initially contemplated an ICSID arbitration: when the dispute ripened, both parties signed a form in which they consented to submit the dispute to the jurisdiction of ICSID. J.A. 319.

It is important to note why they found this later joint consent to be necessary. Under the ICSID Convention, ICSID jurisdiction can only be extended to controversies "which the parties to the dispute consent in writing to submit to [ICSID]." Convention art. 25(1). The written request must "contain information concerning the issues in dispute, the identity of the parties and their consent to arbitration in accordance with the rules of procedure for the institution of conciliation and arbitration proceedings." *Id.* art. 36(2). MINE contended before the District Court that the later joint consent was necessary because "[t]he Contract did not contain language of consent and submission in ac[c]ordance with ICSID's suggested clauses, or otherwise." J.A. 252 n.9. That is, the contract did not "*evidence*[ ]" the consent of both parties to submit the dispute to ICSID's jurisdiction in a way that ICSID could recognize. *Id.* at 252 (emphasis added); *see id.* at 251 (contract "did not of *itself* constitute a mutual consent and submission to ICSID's jurisdiction") (emphasis added).

None of this denies, however, that MINE and Guinea had initially intended their arbitration clause to call for arbitration before ICSID. Guinea was not the only side to contend that this was both parties' intent all along. Time and time again MINE affirmed before the District Court that the original intent of the agreement was to have an ICSID arbitration. *See supra* note 11. Thus, even though the language of the contract was not technically sufficient to invoke ICSID procedures (a fact that led the parties to submit additional evidence of their consent to ICSID's jurisdiction), the conduct of the parties after the dispute had ripened and MINE's own representations before the District Court make clear that the arbitration to which both parties intended initially to agree was an ICSID arbitration.

MINE tries to reconcile these earlier representations with the theory that the parties originally contemplated a non-ICSID arbitration by offering the following scenario: MINE "approached ICSID to determine how and when the President might select the three arbitrators"; ICSID personnel informed MINE that "such a procedure is unknown to the organiza-

Thus, it is the District Court's waiver holding that we now evaluate—that the parties' agreement to submit future disputes to an ICSID arbitration can be deemed an implicit waiver of immunity within the meaning of section 1605(a)(1).

■ Explaining this section, the House Report stated:

> With respect to implicit waivers, the courts have found such waivers in cases where a foreign state has agreed to arbitration in another country or where a foreign state has agreed that the law of a particular country should govern a contract.

H.R.Rep. No. 94–1487, *supra*, at 18, U.S. Code Cong. & Admin.News 1976, p. 6617. Because the SOTRAMAR contract expressly stated that the law of Guinea would apply to interpretation of the contract, J.A. 222, only the first instance mentioned in the quoted language is relevant to the question at hand.[13] Upon considering this phrase in light of the nature of an ICSID arbitration, we conclude that the SOTRAMAR agreement was not an implicit waiver of immunity within the meaning of the FSIA.

As noted earlier, ICSID was established by the Convention on the Settlement of Investment Disputes Between States and Nationals of Other States, an international agreement to which more than seventy-five foreign states are parties. Under the Convention, which has been implemented by legislation in the United States, 22 U.S.C. §§ 1650–1650a (1976), ICSID has "full international legal personality," Convention art. 18. ICSID's purpose is to make available to "Contracting States and nationals of other Contracting States" facilities for the conciliation and arbitration of investment disputes. *Id.* art. 1(2). ICSID arbitrations are undertaken by tribunals constituted under the Convention and subject to the rules of ICSID. *Id.* art. 44. In settling disputes,

---

tion"; MINE "reluctantly concluded that the informal procedure contemplated by the agreement . . . could not be accomplished"; and only then did the parties sign the ICSID consent form. Appellee's Br. 55–56.

The initial problem with this scenario is that the ordering of events it portrays conflicts with the sworn affidavit submitted to the District Court by MINE's attorney. According to that document, MINE's attorney met with an ICSID official, not "to determine how and when the President might select the three arbitrators," as MINE now claims, but "in order to determine whether it was possible to submit the dispute between Petitioner and Respondent *to ICSID* for arbitration . . . ." J.A. 293 (emphasis added). This refutes MINE's present claim that the parties did not contemplate an ICSID arbitration until after the discouraging revelations of this meeting.

Even ignoring evidence discrediting MINE's newest version of events, however, we find no effort by MINE to prove or even to argue this scenario before the District Court. In an effort to show that the immunity provisions of the ICSID Convention never became applicable, MINE did reiterate near the end of oral argument that the contractual arbitration clause alone never amounted to a consent sufficient to trigger ICSID jurisdiction. Transcript of January 8, 1981, Hearing, at 25 (Immunity under the Convention "presupposes that ICSID has jurisdiction and the parties have duly consented to ICSID. [Yet t]he parties did not consent to ICSID . . . . the agreement merely says that the president of ICSID would choose the arbitrator."); *id.* at 25–26 (The vice-president and general counsel of ICSID "did not consider that [contract] adequate consent. There has been no adequate consent for three years."). But we find nothing in any of MINE's arguments that departs from the view it espoused until this present appeal: that the parties intended an ICSID arbitration when they drafted the contract; that the fact that the arbitration clause provided explicitly only for the President of ICSID to choose arbitrators rendered it technically insufficient to get ICSID to act; that, in an effort to carry out this original intent, the parties attempted to submit a technically-correct consent to ICSID; and that for one reason or another these efforts never actually brought the dispute within ICSID's jurisdiction.

Therefore, even had the District Court not found that the parties initially agreed to an ICSID arbitration, we would have ample reason to reject MINE's contrary contention on appeal. At best the contention rests on a factual premise that was not developed before the District Court, *see Carr v. District of Columbia,* 543 F.2d 917, 921–22 (D.C.Cir.1976), and at worst it is contradicted by the factual record that the parties did develop.

13. Of course, an agreement to apply Guinean law is literally an agreement to apply the law of a "particular" country. Courts have generally assumed, however, that Congress did not endorse the literal wording of the House Report, for when paraphrasing the report they say waiver is to be found when a foreign state agrees to apply the law of "another" country. *See Ohntrup v. Firearms Center Inc.,* 516 F.Supp. 1281, 1284 (E.D.Pa.1981) (mem. op.); *Castro v. Saudi Arabia,* 510 F.Supp. 309, 312 (W.D.Tex.1980). Because MINE has not questioned this reading of congressional intent, we see no reason to do so at this time.

those tribunals apply "such rules of law as may be agreed by the parties"; when no such agreement exists, the law of the "Contracting State party" and rules of international law apply. *Id.* art. 42(1).

A primary motivation for the Convention was the recognition that international methods of dispute settlement should be available in addition to national legal processes. *Id.* preamble. As stated in an ICSID general information document, ICSID "provides means for a Contracting State to have a dispute with an investor internationally adjudicated without having to bring action in a foreign court or to undertake intergovernmental litigation with the investor's State." International Centre for Settlement of Investment Disputes, Doc. ICSID/12, *reprinted in* Appellant's Addenda.

The provisions governing ICSID arbitrations give effect to this aim. Article 26 of the Convention states: "Consent of the parties to arbitration under this Convention shall, unless otherwise stated, be deemed consent to such arbitration to the exclusion of any other remedy." In addition, the ICSID processes are self-executing once a proper request is submitted to ICSID: an arbitral tribunal is constituted upon receipt of the request, the tribunal itself decides the issue of jurisdiction, and awards rendered by the tribunal are certified by ICSID as binding and enforceable. *Id.* arts. 36, 41, 49, 53.

Relying on these facts, the State Department has urged this court to find that agreements to arbitrate with ICSID do not contemplate the involvement of domestic courts, at least not before a final ICSID decision is to be enforced.[14] Brief for the United States as Intervenor and Suggestion of Interest 54. We need not reach this precise question here, however. MINE has insisted, and is estopped from denying, that United States courts were powerless to compel an ICSID arbitration under this particular arbitration agreement. Appellee's Br. 57 & n. 49; Appellee's Reply Br. to Br. for United States 23, 25; J.A. 253 (memorandum before District Court) ("as both ICSID and its President enjoy sovereign immunity, this court could not compel the President of the World Bank to appoint arbitrators in this matter"). MINE contended that an ICSID arbitration was unavailable in order to induce the District Court to go beyond the express terms of the arbitration clause and compel arbitration before the American Arbitration Association. Given that this point is now established for purposes of this litigation, we have no trouble holding that this particular ICSID agreement was not an agreement "to arbitration in another country" that waives sovereign immunity under the FSIA.[15] A key reason why pre-FSIA cases found that an agreement to arbitrate in the United States waived immunity from suit was that such agreements could only be effective if deemed to contemplate a role for United States courts in compelling arbitration that stalled along the way. *See, e.g., Victory Transport Inc. v. Comisaria General de Abastecimientos y Transportes,* 336 F.2d 354, 363–64 (2d Cir.1964) (discussing consent to in personam jurisdiction),

---

14. At the enforcement stage, the ICSID treaty, *see* Convention art. 54, and a supporting United States statute, 22 U.S.C. § 1650a (1976), provide that ICSID arbitrations are to be enforced as judgments of sister states. We need not decide whether Guinea's signing of the ICSID treaty would thus waive its immunity from proceedings enforcing ICSID awards, for this is a proceeding to confirm an *AAA* arbitration. We also do not express opinions (1) whether any waiver of immunity for ICSID *enforcement* proceedings would also waive immunity for suits to *compel* ICSID arbitrations, or (2) whether Congress's declaration that the Federal Arbitration Act "shall not apply to enforcement of awards rendered" by ICSID, *id.,* prohibits proceedings to *compel* ICSID arbitrations. Resolution of neither point is implicit in our holding today, for we decide that this ICSID agreement did not contemplate the involvement of domestic courts before the en-

forcement stage only because MINE cannot contend otherwise in this litigation.

15. Because the ICSID arbitration was to take place in the United States unless otherwise specified, *see* pp. 1100 *supra,* we need not speculate about whether the courts of some other country might find themselves empowered to compel an ICSID arbitration. Thus, although other courts have found it necessary to hold that only an agreement to arbitrate in *this* country will waive a sovereign's immunity in United States courts, *see Ohntrup v. Firearms Center Inc.,* 516 F.Supp. 1281, 1285 (E.D.Pa. 1981) (mem. op.); *Verlinden B.V. v. Central Bank of Nigeria,* 488 F.Supp. 1284, 1301–02 (S.D.N.Y.1980), *aff'd on other grounds,* 647 F.2d 320 (2d Cir.1981), *cert. granted,* —— U.S. ——, 102 S.Ct. 997, 71 L.Ed.2d 291 (1982), we do not settle that question here.

*cert. denied,* 381 U.S. 934, 85 S.Ct. 1763, 14 L.Ed.2d 698 (1965); *see also* Note, *Maritime International Nominees Establishment v. Republic of Guinea:* Effect on U.S. Jurisdiction of an Agreement by a Foreign Sovereign to Arbitrate Before the International Centre for the Settlement of Investment Disputes, 16 Geo.Wash.J. Int'l L. & Econ. 451, 463–66 (1982). As this particular ICSID agreement concededly did not foresee such a role for United States courts, we hold that it did not waive Guinea's sovereign immunity even though the agreed-to arbitration would probably take place on United States soil.

### B.

The second immunity provision relevant to this case is section 1605(a)(2). This section sets forth, in the words of the House Report, "probably the most important instance in which foreign states are denied immunity, that in which the foreign state engages in a commercial activity." H.R. Rep. No. 94–1487, *supra,* at 18, U.S.Code Cong. & Admin.News 1976, p. 6617. The section states that a foreign state shall not be immune in any case

> in which the action is based upon [1] a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

The District Court seems to have held that both the first and third clauses of the section were satisfied. *MINE v. Guinea,* 505 F.Supp. at 143. After stating this conclusion, the court went on to list the activities of Guinea that supported it:

> Numerous meetings were held, including meetings in Connecticut and in the District of Columbia, relating to the contract. Guinea directed an American ship-

ping group to perform substantial activities to aid SOTRAMAR. The Guinean ambassador to the United States engaged in several business-oriented contacts with officials of petitioner [MINE] related to the project.

*Id.* The sum of these activities, the court continued, was "more than sufficient to constitute commercial activity within the meaning of section 1605(a)(2)." *Id.* To examine this holding, we turn separately to the first and third clauses of section 1605(a)(2).[16]

#### 1.

The first clause, like the remaining two, contains the phrase "commercial activity," which the Act defines as follows:

> A "commercial activity" means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

28 U.S.C. § 1603(d) (1976). The first clause receives further definition:

> A "commercial activity carried on in the United States by a foreign state" means commercial activity carried on by such state and having substantial contact with the United States.

*Id.* § 1603(e).

Part of the first clause is easily applied in this case. The "regular course of commercial conduct" or "particular commercial transaction" on which MINE's action "is based" is the SOTRAMAR contractual undertaking; that activity clearly is of the commercial nature contemplated by the Act's exceptions. *See* H.R.Rep. No. 94–1487, *supra,* at 16. The more difficult question is whether the SOTRAMAR venture was "carried on in the United States by a foreign state," that is, "carried on by such state and having substantial contact with the United States." Upon examining the findings of the District Court,[17] we must answer this question in the negative.

---

**16.** The second clause has no relevance to this case. The "act" on which this action is "based"—the alleged breach of the SOTRAMAR contract—is not claimed to have been "performed in the United States."

**17.** MINE adds to these findings the argument that Guinea's alleged breach resulted in "con-

tact with the United States" for purposes of the first clause: "Each ton of bauxite which should have been carried by SOTRAMAR to destinations in the United States was instead carried to those same destinations by Afro-Bulk." Appellee's Br. 26. The District Court made no such finding, and MINE supports its contention in part with evidence outside the record. *Id.;*

We turn first to the District Court's conclusion that "Guinea directed an American shipping group to perform substantial activities to aid. SOTRAMAR." *MINE v. Guinea,* 505 F.Supp. at 143. An analysis of this finding must immediately confront the Act's requirement that the commercial activity be "carried on by" the foreign state. We have no doubt that in appropriate circumstances the activities of another may be attributed to the foreign state for purposes of the section 1605(a)(2) exception. Especially given the realities of modern commercial undertakings, a contrary conclusion would undermine "Congress's concern with providing 'access to the courts' to those aggrieved by the commercial acts of a foreign sovereign," *Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300, 312 (2d Cir.1981) (quoting H.R. Rep. No. 94–1487, *supra,* at 6), *cert. denied,* —— U.S. ——, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982). On the other hand, this same principle and the words of the statute impose some limits on when a foreign state can be deemed to have "carried on" activities actually performed by another.

The legislative history gives some guidance in discovering those limits. Although Congress did not elaborate on the "carried on by" requirement, it stated that some activities falling within the first clause of section 1605(a)(2) might also satisfy the second: an "act performed in the United States in connection with a commercial activity of the foreign state elsewhere." One example of the latter, Congress went on, might be "a representation in the United States by an agent of a foreign state that leads to an action for restitution based on unjust enrichment." H.R.Rep. No. 94–1487, *supra,* at 19, U.S.Code Cong. & Admin.News 1976, p. 6617. This reference to "an agent of a foreign state" suggests that a foreign state, in Congress's view, can surrender immunity by virtue of activities committed by an agent, and that, consequently, the "carried on by" requirement can be inter-

preted in light of broad agency principles. While we do not suggest that those principles should be applied rigidly and in all their detail to the immunity determination, it seems evident that to throw the net of responsibility much wider would be to ignore the words Congress employed in both the statute and the legislative history.

■ We also think it appropriate to note the well-established principle that, in assessing personal jurisdiction under either a constitutional due process standard or a statutory standard, courts may look to the contacts between the forum and agents of the defendant. *Texas Trading,* 647 F.2d at 314–15; C. Wright & A. Miller, Federal Practice and Procedure § 1069, at 251–52 (1969). This principle is of relevance to the immunity exception because Congress viewed that exception not only as governing the immunity determination, but also as representing a central component in the Act's structure for personal jurisdiction:

> For personal jurisdiction to exist under section 1330(b), the claim must first of all be one over which the district courts have original jurisdiction under section 1330(a), meaning a claim for which the foreign state is not entitled to immunity. . . . These immunity provisions, therefore, prescribe the necessary contacts which must exist before our courts can exercise personal jurisdiction.

H.R.Rep. No. 94–1487, *supra,* at 13, U.S. Code Cong. & Admin.News 1976, p. 6612. Although we do not understand this statement to mean that the statutory standard for determining non-immunity is coextensive with the due process standard governing personal jurisdiction,[18] *see World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), we think it relevant that viewing the "carried on by" requirement in light of agency principles would be compatible with well-established due process analysis.

---

see Fed.R.App.P. 10. As will be clear from our discussion of the contacts listed by the District Court, the record properly before us cannot sustain the assertion, implicit in MINE's argument, that under the SOTRAMAR contract arrangements had been made to transport bauxite to destinations in the United States.

**18.** Of course, a finding of FSIA personal jurisdiction, which would rest in part on a finding of non-immunity, must comport with the demands

of due process, and Congress intended that the Act satisfy those demands, H.R.Rep. No. 94–1487, *supra,* at 13. But the immunity determination involves considerations distinct from the issue of personal jurisdiction, and the FSIA's interlocking provisions are most profitably analyzed when these distinctions are kept in mind. *See generally Texas Trading,* 647 F.2d 300; Kane, Suing Foreign Sovereigns: A Procedural Compass, 34 Stan.L.Rev. 385, 402–04 (1982).

Our views find support in several decisions of other courts. In *Yessenin-Volpin v. Novosti Press Agency,* 443 F.Supp. 849 (S.D.N.Y.1978), plaintiff filed a libel suit against three defendants, two of which were Soviet Union information agencies that claimed immunity under the FSIA. Both were alleged to have written defamatory articles and to have caused the publication of those articles in periodicals that were circulated to the public in the United States. Applying the section 1605(a)(2) exception, the court rejected the relevance of the first clause, because "the allegedly offending articles were published outside the country and sent into the United States by means wholly outside the control of either [defendant]." *Id.* at 855. The court, in other words, properly rejected the proposition that a foreign state "carries on" activities performed by another entity simply because the state and that entity, although unconnected with each other, can both be seen as participating in the same larger commercial endeavor.

In *Bankers Trust Co. v. Worldwide Transportation Services, Inc.,* 537 F.Supp. 1101 (E.D.Ark.1982), a restitution action involving as one defendant an official agricultural organ of the Federal Republic of Mexico, the court held that the "commercial activity" of that defendant included activities performed by a bank and a company acting as the defendant's agents in the United States.

■ Before examining against this conceptual backdrop the District Court's finding that "Guinea directed an American shipping group to perform substantial activities to aid SOTRAMAR," we should examine the evidence in the record relevant to that finding. The record discloses that fairly substantial SOTRAMAR-related activities were undertaken in the United States by a company usually referred to as "Global." J.A. 265, 270–72. There is evidence that Global maintained an office in Stamford, Connecticut. J.A. 270–71.

Global's activities can be grouped under two categories. First, there is evidence that Global played a major role in preparing a report, termed a "feasibility" or "technical" study, in connection with the SOTRAMAR venture. J.A. 273, 288. In connection with this report, the record suggests, Global held meetings, expended funds, and prepared route and rate computations in the United States. J.A. 270–72. Second,

the record contains evidence that Global's connection with SOTRAMAR went beyond the preparation of the report, and extended also to involvement in the shipping of Guinean bauxite. J.A. 275–77.

As to the connection between MINE and Global, the record contains evidence of communication and cooperation between MINE and Global on the report. J.A. 270–72. There are also statements in the record that suggest communication between MINE and Global with respect to Global's other activities. J.A. 276–78. No evidence at all concerns the nature of Global's corporate structure, and the only evidence of the organizational relationship between MINE and Global are the several references to "MINE/Global." J.A. 231, 233.

The record casts an even dimmer light on the connection between Guinea and Global. The second codicil to the SOTRAMAR contract contains two references to "MINE/Global." The first notes that delegates of Guinea and of MINE/Global met to agree upon the codicil. J.A. 231. The second states:

In order to make it compatible with that option of lease-sale of a part of the ships supplied by MINE/GLOBAL, the Addendum [the first codicil] of October 11, 1971 is added to as follows:

"The other ships shall fly a flag agreed to by both parties, which flag in fact shall be the neutral one of Panama for the duration of the lease-sale."

J.A. 233.

Finally, there is some evidence connecting Guinea with the report. The record includes a letter, dated September 11, 1972 and written by MINE's then-attorney to a Guinean representative, concerning the former's views as to "the problems now facing SOTRAMAR." J.A. 288. The letter contains the following statement:

Many different methods of obtaining ships for SOTRAMAR have been detailed. For example, at the request of the Guinean partners, MINE prepared an extensive technical study which was presented at the May 1972 meeting in Conakry [Guinea].

J.A. 288. Another record item suggests that MINE and Global, while preparing the report, contemplated presenting it to Guinea at a future date. J.A. 272. Also deserving of mention is the provision in the SOTRAMAR contract stating that the parties

would make a "market study" before SO-TRAMAR was formed. J.A. 225.

Although the District Court's conclusion that Guinea "directed" Global to perform activities may be interpreted several ways, it can satisfy the first clause only if read to mean that Guinea authorized Global to perform actions on Guinea's or SOTRAMAR's behalf in the United States. *See* Restatement (Second) of Agency §§ 1, 26 (1958). The record cannot sustain this reading, however, even when analyzed with the understanding that the necessary authorization can be conferred by a variety of means, *see id.* § 26.

We note at the outset, with respect both to the preparation of the report and to other activities performed by Global, that there is no evidence of any written or otherwise express authorization from Guinea to Global. Our inquiry thus becomes whether anything in the record can reasonably be read to imply authorization of Global's services. First, concerning activities related to the report, we find that the record contains no evidence supporting this implication. The statement in the letter from MINE's attorney suggests only that Guinea requested MINE to prepare a report. Although a request to one party may, by its nature or context, necessarily imply the need to enlist the services of another, *see id.* § 79, MINE has not shown that Guinea's request was of this sort. Similarly, MINE has not shown that the provision in the SOTRAMAR contract requiring the parties to make a "market study," J.A. 225, constituted an authorization by Guinea for MINE to use Global's services on Guinea's behalf.

Moreover, the mention in the record that MINE and Global eventually presented the report to Guinea does not evidence sufficient knowledge of or acquiescence in Global's involvement. The record contains nothing to indicate that Guinea monitored or received information about the report during its preparation. One portion of the record, in fact, suggests the opposite. At the arbitration hearings, MINE's former attorney testified as follows:

> So this work [the report] was done in Stamford and with the aid of their [Global's] technicians, their general counsel, me, their outside counsel, Mr. Anada[19]

attended substantially all of those meetings from Geneva, other people would come from Geneva, and we worked out how the financing would work, what rates were necessary and so on. Then you will also find it was necessary to show the not too sophisticated Guinean people when they would see this report why it was being done this way.

J.A. 272.

Second, with respect to any non-report-related activities, the record is likewise devoid of evidence from which we can infer implicit authorization. The only record item of any relevance is the second codicil, with its mention that delegates of "MINE/Global" met with Guinea and that the first codicil had been amended "to make it compatible with that option of lease-sale of a part of the ships supplied by MINE/Global." These references, standing alone, are too sparse in detail to allow a conclusion that Global was acting under authority conferred by Guinea.

We must conclude, then, that Guinea did not "carry on" the activities performed by Global. Global, of course, was not the only entity that acted in the United States; several items in the above-described record suggest that MINE also undertook actions there. We hesitate to evaluate these facts at length, for the District Court made no finding that Guinea "directed" these activities. The record might support a conclusion, however, that Guinea requested MINE to prepare a study, *supra* p. 1106, and that MINE attended meetings in the United States with Global in connection with that study. *See* J.A. 265, 270–71. We cannot say with certainty that the report requested was actually the same report MINE worked on in the United States. But even if it was, the record does not show that the understanding between MINE and Guinea reached the stage at which MINE's actions in the United States could be deemed to be carried on by Guinea for purposes of the FSIA. Explaining why this is so requires us to sharpen slightly the principles that govern this inquiry.

We have said that Global's activities in the United States cannot waive Guinea's immunity if Guinea did not authorize them. But this is not to say that every action

**19.** According to MINE's memorandum in reply to Guinea's motion to dismiss, Mr. Anada was a MINE official. J.A. 239 n. 5.

Guinea "authorizes" which eventually touches American soil will waive Guinea's immunity. We find aid in discerning the far reaches of the "carried on" requirement by considering once more principles of personal jurisdiction.[20] The Supreme Court helped clarify some of those principles in *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239–1240, 2 L.Ed.2d 1283 (1958):

> The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State.... [I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.

*Accord Texas Trading,* 647 F.2d at 314–15 (applying test to foreign sovereign).

In this case the record will not support the conclusion that, through MINE's meetings with Global in the United States concerning the preparation of a report, Guinea purposefully availed itself of the benefits of conducting business in the United States. MINE has offered no evidence that Guinea requested that the study be done in the United States. Nor has it shown that preparation of a preliminary market study is an activity necessarily, foreseeably, or likely to be undertaken in the United States. And we do not find MINE's activities in the United States to be so extensive that we will impute to Guinea, without more, a purposefulness that is not otherwise found in the record. We are concerned, of course, by the fact that Guinea in some sense benefited from activities conducted in the United

States by MINE. But in an interdependent world economic system many foreign states may benefit from the acts of others in the United States but still not be considered themselves to be conducting business in the United States within the contemplation of Congress. We thus find that MINE has not proved Guinea to be sufficiently a part of MINE's activities in the United States that Guinea surrendered its immunity by virtue of those activities.[21]

Continuing our search for activity that might satisfy the first clause of section 1605(a)(2), we turn to the District Court's finding that "[n]umerous meetings were held, including meetings in Connecticut and in the District of Columbia, relating to the contract." *MINE v. Guinea,* 505 F.Supp. at 143. There is evidence that meetings took place, but, with one exception, no reference to such a meeting indicates that Guinea was present. Because these references do not contain any information that adds to the evidence of authorization that we have already considered, these meetings cannot be seen as activity "carried on by" Guinea.

The one exception is a meeting between MINE and a Guinean representative or representatives, which took place in a Washington, D.C., hotel in September 1973, and which apparently concerned the operation of SOTRAMAR. J.A. 278, 288. Although this meeting is mentioned in a fairly lengthy letter from MINE's then-attorney to a Guinean representative, the letter primarily summarizes the history of SOTRAMAR-related discussions, and therefore gives no clear sense of the scope of the Washington meeting.[22] Whether the requirement of "substantial contact" is satisfied requires evaluation not only of this

---

**20.** We are bound in a more basic sense, of course, by constitutional precepts of personal jurisdiction, but we go no further than the statute itself to decide this particular question. And we note once more that while personal jurisdiction principles shed light on the immunity determination, the two inquiries are not entirely the same. *See supra* note 18.

**21.** Because we find the link between Guinea on one hand and MINE's report activities in the United States on the other to be too weak to attribute MINE's actions here to Guinea, we necessarily find that the path from Guinea to MINE and then from MINE to Global stretches too far to link Guinea with Global indirectly. We distinguish this point from our discussion

earlier, *supra* pp. 1106–1107, showing the lack of evidence directly linking Global with Guinea.

**22.** The letter begins with the following statement:

> Following the meeting of Sunday, September 9, 1973, in Washington, MINE, Inc. believes it useful to lay before you for your consideration the following views of the problems now facing SOTRAMAR.

J.A. 288. No further reference is made to the Washington meeting until near the letter's conclusion:

> In view of the facts set forth above and the references of Your Excellency on September 9, 1973 to the need to change the entire basic SOTRAMAR Convention ....

J.A. 291.

meeting, but also of the District Court's third finding.

Although the third finding states that "[t]he Guinean ambassador to the United States engaged in several business-oriented contacts with officials of [MINE] related to the project," *MINE v. Guinea,* 505 F.Supp. at 143, the record contains a suggestion of only one such contact. A portion of a MINE official's arbitration testimony relates the following:

> But when we discovered about this breach or about the negotiations with Afrobulk, we were very disappointed and we asked for a meeting with the Guineans. We came to see the ambassador in Washington also, asking him—we were sent actually to see him by the government.

J.A. 267. This vague statement is scarcely evidence that a meeting occurred at all, and we can only speculate as to that meeting's scope or nature.

An evaluation of these two contacts under the first clause must begin with the recognition that, in Judge Weinfeld's words, Congress "underscore[d] the fact that the 'commercial activity carried on in the United States' must be substantial to support jurisdiction." *Verlinden B.V. v. Central Bank of Nigeria,* 488 F.Supp. 1284, 1296 (S.D.N.Y.1980), *aff'd on other grounds,* 647 F.2d 320 (2d Cir.1981), *cert. granted,* ——— U.S. ———, 102 S.Ct. 997, 71 L.Ed.2d 291 (1982). In choosing those words, Congress made clear that the immunity determination under the first clause diverges from the "minimum contacts" due process inquiry, as well as from jurisdictional determinations under state long-arm statutes.[23] We cannot conclude that these two isolated meetings amounted to more than "transitory" and "insubstantial" contact for purposes of the Act, *see Verlinden,* 488 F.Supp. at 1297, especially given their uncertain scope and importance.[24]

*2.*

■ Having concluded that the District Court's three findings do not satisfy the first clause of the section 1605(a)(2) excep-

---

**23.** The legislative history does not contradict the clear import of the words Congress chose. Commenting on section 1330(b), which concerns personal jurisdiction under the Act, the House Report stated that the immunity provisions "prescribe the necessary contacts [the "minimum contacts" requirement of *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945) ] which must exist before our courts can exercise personal jurisdiction." H.R.Rep. No. 94–1487, *supra,* at 13, U.S.Code Cong. & Admin.News 1976, p. 6612. To read "substantial contact" as demanding more than "minimum contacts" is fully compatible with this statement.

Congress also noted that section 1330(b) is "in effect, a Federal long-arm statute over foreign states .... It is patterned after the long-arm statute Congress enacted for the District of Columbia." H.R.Rep. No. 94–1487, *supra,* at 13, U.S.Code Cong. & Admin.News 1976, p. 6612. The phrase "patterned after" is not a clear mandate to interpret the immunity exceptions in light of the District of Columbia long-arm statute, and "[t]here are significant differences in language and effect between the District's statute and the Act, which Congress, the author of both, could not have overlooked," *Verlinden,* 488 F.Supp. at 1295. *Accord Texas Trading,* 647 F.2d at 311; *Harris v. VAO Intourist,* 481 F.Supp. 1056, 1063–65 (E.D.N.Y.1979)

(mem. op.). While these differences might not always undermine the usefulness of referring to the District of Columbia statute, *see VAO Intourist,* 481 F.Supp. at 1064–65, the "substantial contact" requirement has not even a remote relative in that statute. *See* D.C.Code § 13–423(a)(1) (1981) (allows personal jurisdiction as to a claim arising from the person's "transacting any business in the District of Columbia").

**24.** Although case law construing the phrase "substantial contact" is not extensive, our conclusion finds support by way of contrast with cases that find jurisdiction. *See Gemini Shipping, Inc. v. Foreign Trade Org. for Chems. & Foodstuffs,* 647 F.2d 317, 319 (2d Cir.1981) (defendant solicited bids in U.S. and paid under a contract through a letter of credit confirmed by a New York bank); *Ohntrup v. Firearms Center Inc.,* 516 F.Supp. 1281, 1285–86 (E.D.Pa. 1981) (mem. op.) (sales agreement was between defendant and U.S. corporation; defendant agreed that U.S. corporation would be its representative in U.S.; and agreement called for substantial sales in U.S. within first year of contract); *Behring Int'l, Inc. v. Imperial Iranian Air Force,* 475 F.Supp. 383, 390 (D.N.J.1979) (contract was negotiated and executed in New York, where defendant maintained office and picked up contracted-for cargo).

tion, we look next[25] to the third clause of that section:

> A foreign state shall not be immune ... in any case ... in which the action is based upon ... an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

As noted earlier, the District Court may be read as concluding that its three findings met the standard of this clause. The court did not explain, however, how those activities gave rise to a "direct effect in the United States" within the meaning of the Act.

MINE argued before the District Court that the third clause applies because the contractual breach "had a direct effect on Global." J.A. 248. On appeal, MINE renews and elaborates upon this argument with the following assertions: "In the later stages" of the SOTRAMAR venture, Global "became closely allied with MINE"; Global "was to place many of its ships on line to implement direct carriage of bauxite to the United States"; Global "committed substantial financial resources of its own to the venture" and therefore "stood to realize profits as part of the MINE group of affiliated companies participating in the joint venture with Guinea"; and, finally, Guinea's breach prevented Global from realizing those profits. Appellee's Br. 27–28.

We note at the outset the difficulty of discerning whether these factual allegations were found to be true by the District Court. Before the District Court, MINE did not offer such detailed facts to explain how the breach had a direct effect on Global, *see* J.A. 55, 248, and the "substantial activities"

mentioned in the court's findings might well include both the preparation of the report and other SOTRAMAR-related actions.

But our difficulty with MINE's argument goes further than the possible absence of necessary findings in support of it. Under our reading of the third clause, even the scenario MINE offers on appeal does not constitute a "direct effect in the United States." This third clause, the House Report stated,

> would embrace commercial conduct abroad having direct effects within the United States which would subject such conduct to the exercise of jurisdiction by the United States consistent with principles set forth in section 18, Restatement of the Law, Second, Foreign Relations Law of the United States (1965).

H.R.Rep. No. 94–1487, *supra,* at 19, U.S. Code Cong. & Admin.News 1976, p. 6618. Section 18, which is entitled "Jurisdiction to Prescribe with Respect to Effect within Territory," Restatement (Second) of Foreign Relations Law of the United States § 18 (1965), concerns the extent to which a state may enact rules of law proscribing conduct outside its territory to prevent the effects of that conduct within its territory. Although section 18 is therefore concerned with legislative rather than judicial action, Congress's clear reference has led some courts to find guidance in section 18's requirement that the effect be "substantial" and "occur[ ] as a direct and foreseeable result of the conduct outside the territory."[26] *See Ohntrup v. Firearms Center Inc.,* 516 F.Supp. 1281, 1286 (E.D.Pa.1981) (mem. op.); *Chicago Bridge & Iron Co. v. Is-*

---

**25.** *See supra* note 16.

**26.** Section 18 reads as follows:

A state has jurisdiction to prescribe a rule of law attaching legal consequences to conduct that occurs outside its territory and causes an effect within its territory, if either

  (a) the conduct and its effect are generally recognized as constituent elements of a crime or tort under the law of states that have reasonably developed legal systems, or

  (b)(i) the conduct and its effect are constituent elements of activity to which the rule applies; (ii) the effect within the territory is substantial; (iii) it occurs as a direct and foreseeable result of the conduct outside the territory; and (iv) the rule is not inconsistent with the principles of justice generally recognized by states that have reasonably developed legal systems.

lamic Republic of Iran, 506 F.Supp. 981, 989 (N.D.Ill.1980) (mem. op.); *Verlinden*, 488 F.Supp. at 1298; *Harris v. VAO Intourist*, 481 F.Supp. 1056 (E.D.N.Y.1979) (mem. op.); *see also* Note, Direct Effect Jurisdiction Under the Foreign Sovereign Immunities Act of 1976, 13 N.Y.U.J.Int'l L. & P. 571, 609–10 (1981). *But see Texas Trading*, 647 F.2d at 311 & n. 32; Note, Effects Jurisdiction Under the Foreign Sovereign Immunities Act and the Due Process Clause, 55 N.Y.U.L.Rev. 474, 502–05 (1980).

Another factor favoring recourse to section 18 lies in the scope of the FSIA's direct effect clause. The clause differs from the "direct effect" clauses found in many state long-arm statutes, because the former is explicitly intended to encompass effects resulting from commercial as well as tortious activities. *See Texas Trading*, 647 F.2d at 311; *VAO Intourist*, 481 F.Supp. at 1063–64; H.R.Rep. No. 94–1487, *supra*, at 19. The "substantial" and "direct and foreseeable" standards are likewise intended to apply in commercial contexts. *See* Restatement (Second) of Foreign Relations Law of the United States, *supra*, § 18 comment f. In view of Congress's statement, and of the not dissimilar functions of section 18 and the third clause,[27] we consider this source of guidance a proper one.

The direct effect scenario offered by MINE falls short of satisfying these principles; we cannot conclude that the alleged injury to Global was a foreseeable result of any breach by Guinea. To explain this conclusion, it is important to note that the alleged injury to Global is not that Global went unrecompensed for services rendered to SOTRAMAR, but that Global lost anticipated profits. This alleged injury occurred only because Global became involved in the SOTRAMAR undertaking in such a way that it stood to realize some of the profits of that undertaking.

Applying the "direct effect" standard to this injury, and without attempting to state generally the circumstances when a commercial activity results in direct and foreseeable consequences, we think that an effect cannot be deemed direct if it occurs solely because of conduct not reasonably contemplated by the commercial activity.[28] Only if involvement such as Global's was reasonably contemplated under the SOTRAMAR undertaking can we view as "direct" the injuries resulting from that involvement.

Neither the SOTRAMAR contract nor any other evidence in the record demonstrates that Global's profit-anticipating involvement was anything but the result of conduct by MINE and Global outside the agreed-upon bounds of the SOTRAMAR endeavor. Although the SOTRAMAR contract appears to have envisioned a broad market,[29] that goal would not, in itself, necessarily entail the substantial involvement of an American company hoping to realize profits from the venture. Neither

---

**27.** Although section 18 addresses legislative action, both section 18 and the third clause relate to when an action having an effect within the United States can trigger the exercise of authority by the United States. *See* Restatement (Second) of Foreign Relations Law of the United States, *supra*, § 18 comment b (§ 18 concerns "the question whether the conduct of [an] alien outside the territory had an effect within the territory of a type which justifies the state in prohibiting or regulating this conduct").

**28.** Explaining the application of the foreseeability requirement in the commercial context, the comment to section 18 states:

[T]he rule stated in this Clause does not require intent in the subjective sense, and will usually deal with conduct which was intended to produce the effect within the territory in the sense that those responsible for the conduct had reason to foresee that the effect within the territory would result from the conduct outside.

Restatement (Second) of Foreign Relations Law of the United States, *supra*, § 18 comment f.

**29.** Article II of the contract stated in part:

The COMPANY'S policy shall be to offer at all times and anywhere freight services at competitive international rates. However, for political reasons, [Guinea] reserves the right to exclude certain countries from the traffic of the COMPANY'S ships.

J.A. 209.

does the second codicil's reference to "ships supplied by MINE/Global" show that Global could have been anticipated as becoming involved in such a way that it would suffer harm if SOTRAMAR never realized profits.

### IV.

Under our reading of the FSIA, the record cannot sustain a finding that Guinea lost its sovereign immunity by virtue of waiver or of commercial activity. Because non-immunity is a condition to subject matter jurisdiction under the FSIA, we reverse the District Court's conclusion that it had subject matter jurisdiction to confirm the arbitration award.

*It is so ordered.*