# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 5, 2023          Decided December 8, 2023

No. 23-7077

VALORES MUNDIALES, S.L., AND CONSORCIO ANDINO, S.L.,
APPELLEES

v.

BOLIVARIAN REPUBLIC OF VENEZUELA, MINISTERIO DEL
PODER POPULAR PARA RELACIONES EXTERIORES,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:19-cv-00046)

———

*Miguel López-Forastier* argued the cause for appellees. With him on the briefs were *José E. Arvelo*, *Amanda Tuninetti*, and *José F. Girón*.

*Juan O. Perla* argued the cause for appellant. With him on the brief were *Joseph D. Pizzurro*, *Sylvi Sareva*, and *Rebecca Meyer*.

Before: RAO, *Circuit Judge*, CHILDS, *Circuit Judge*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: The International Centre for Settlement of Investment Disputes ("ICSID") was established in 1966 by a multilateral convention designed to promote international investment. ICSID aims to fulfill the goal of its generating convention by providing reliable dispute resolution processes for member states and nationals of other member states. However, ICSID is not authorized to enforce arbitration awards issued pursuant to its procedures. Rather, the parties to any such proceeding must rely on the courts of member states to enforce awards issued by an Arbitral Tribunal convened in accordance with the ICSID Convention. *See* ICSID Convention, art. 54, 17 U.S.T. 1270. Thus, as a signatory to the ICSID Convention, the United States has agreed that an ICSID award will "be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States." 22 U.S.C. § 1650a(a).

This case concerns a claim against Venezuela, a debtor subject to an ICSID arbitration award. In 2013, two Spanish companies, Valores Mundiales, S.L. and Consorcio Andino, S.L. (together, "Valores") commenced an arbitration under the ICSID Convention claiming that Venezuela forcibly occupied and decreed the expropriation of the assets of the two companies. An ICSID Arbitral Tribunal ruled in favor of Valores, ordering Venezuela to pay more than $430 million in compensation, plus attorneys' fees and costs. Venezuela then sought to annul the Arbitral Tribunal's award. Valores, in turn, filed an action to enforce the award in the United States District Court for the District of Columbia. The District Court stayed the enforcement action pending disposition of the ICSID annulment proceeding.

After the parties' briefs had been submitted in the annulment proceeding, the National Assembly of Venezuela ceased to recognize Nicolás Maduro as President and named Juan Guaidó as Interim President. Representatives for the Interim Government requested the ICSID Annulment Committee to allow it to replace the lawyers representing Venezuela in the annulment proceeding. After careful review of the matter, the ICSID Annulment Committee concluded that the lawyers who had been representing Venezuela should continue through the conclusion of the annulment proceeding. The ICSID Annulment Committee ultimately rejected Venezuela's request to annul the Arbitral Tribunal's award and granted Valores the attorneys' fees incurred as a result of Venezuela's failed bid.

When the proceeding before the District Court resumed, Venezuela opposed enforcement of the judgments issued by the Arbitral Tribunal and the Annulment Committee. Venezuela claimed that it had been deprived of due process because the ICSID Annulment Committee had declined to recognize counsel designated by the Guaidó regime. Venezuela also argued that, because the United States had formally recognized the Guaidó regime, the District Court should not enforce the ICSID awards. Finally, Venezuela argued that Valores had forfeited any claim to fees awarded by the Annulment Committee.

The District Court found that no due process violations occurred in the ICSID proceedings. *Valores Mundiales, S.L. v. Bolivarian Republic of Venezuela*, 2023 WL 3453633, at \*5-6 (D.D.C. May 15, 2023). The court concluded that, under Section 1650a, if ICSID would treat the contested award as binding, a federal district court must as well. *Id*. at \*5. The District Court explained that, "[u]nder both the ICSID

Convention and the U.S. implementing legislation, a U.S. court is not permitted to examine an ICSID award's merits, its compliance with international law, or the ICSID tribunal's jurisdiction to render the award." *Id*. (internal quotation omitted). And the District Court also made it clear that, in enforcing the awards emanating from the ICSID proceedings, it was "not recognizing any regime as the current official government of Venezuela." *Id.* at \*7. The court thus granted Valores's motion for summary judgment and allowed enforcement of fees and costs awarded by the Arbitral Tribunal and the Annulment Committee. *Id*. Venezuela then appealed to this court.

We find no merit in Venezuela's challenges to the District Court's decision. As we explain below, the District Court committed no error in construing the prescriptions of the ICSID Convention and applying the full faith and credit requirement of 22 U.S.C. § 1650a. We therefore affirm the summary judgment and awards of fees and costs issued by the District Court in favor of Valores.

## I. BACKGROUND

### A. *ICSID Convention and Section 1650a*

The ICSID Convention, *opened for signature* Mar. 18, 1965, 17 U.S.T. 1270, 575 U.N.T.S. 159, is a multilateral treaty aimed at promoting private international investment. *See Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, 863 F.3d 96, 100 (2d Cir. 2017) (citing ANTONIO R. PARRA, THE HISTORY OF ICSID 11-12, 24-26 (2012)). The goals of the ICSID Convention are accomplished through ICSID, which is charged with maintaining a legal framework and a reliable process for the resolution of disputes between private investors and governments. *See id.* at 100-101; *see also Mar. Int'l*

*Nominees Establishment v. Republic of Guinea*, 693 F.2d 1094, 1096 (D.C. Cir. 1982) ("[ICSID's] purpose is to provide an international conciliation and arbitration forum.").

ICSID is based in Washington, D.C. *See* ICSID Convention art. 2. The ICSID Convention authorizes ICSID to convene arbitration, mediation, and fact-finding panels to address disputes between international investors and Contracting States. *See id*. arts. 1(2), 7, 25(1), 28. States that have signed the ICSID Convention and ratified it under their domestic law qualify as "Contracting States." *See id*. arts. 67, 68(1); *see also* INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES, GUIDE TO MEMBERSHIP IN THE ICSID CONVENTION 5 (2020), https://icsid.worldbank.org/sites/default/files/ Guide_to_Membership_in_the_ICSID_Convention_2020.pdf.

Any Contracting State or national of a Contracting State may request that ICSID institute arbitration proceedings to resolve an investment dispute. ICSID Convention art. 36(1). A request for arbitration is registered by ICSID unless the dispute is manifestly outside ICSID's jurisdiction. *See id.* art. 36(3). If the parties cannot timely agree on an Arbitral Tribunal, *see id.* art. 37, 38, the ICSID Chairman will appoint an Arbitral Tribunal, *see id.* art. 38. The ICSID Convention contains measures to ensure the neutrality of ICSID Arbitral Tribunals, mandating that arbitrators appointed by the ICSID Chairman "shall not be nationals of the Contracting State party to the dispute or of the Contracting State whose national is a party to the dispute." *Id.* During the proceedings, parties may present written and oral argument to the arbitration panel; they may also be represented by counsel. INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES, ICSID ARBITRATION RULES Rules 2(2), 30, 32 (2022), https://icsid.worldbank.org/sites/default/files/Arbitration_Rule s.pdf. After consideration of the parties' presentations and the

governing law, the Tribunal issues a written decision and award. *See* ICSID Convention arts. 42(1), 48(2). The Tribunal's disposition of a case must address every question submitted by the parties and must state the reasons upon which the arbitration decision and award are based. *Id.* art. 48(3).

The only route for setting aside an ICSID Arbitral Tribunal's award is through the ICSID Convention's annulment process. *See id.* arts. 52, 53(1); CHRISTOPH H. SCHREUER, COMMENTARY ON THE ICSID CONVENTION 1225 (3d ed. 2022) ("SCHREUER, COMMENTARY"). Either party to a dispute may request annulment of an award. ICSID Convention art. 52(1). Mirroring the initial arbitration process, upon receipt of an annulment application, an *ad hoc* committee of three arbitrators is appointed to preside over the annulment proceedings. *Id.* art. 52(3). And, again much like the arbitration process, the ICSID Convention requires that extensive steps be taken to ensure the neutrality of the Annulment Committee. *Id.* No member of the initial Arbitral Tribunal may be part of the Annulment Committee. *Id.* Additionally, no member of the Annulment Committee may share a nationality with any member of the initial Arbitral Tribunal or the private investor party to the dispute, nor may an Annulment Committee member share the nationality of the Contracting State party to the dispute. *Id.* The same rules of procedure that apply to Arbitral Tribunals apply to Annulment Committees. *Id.* art. 52(4). Among the grounds the ICSID Convention recognizes as bases for annulment is "a serious departure from a fundamental rule of procedure." *Id.* art. 52(1)(d).

The ICSID Convention does not give ICSID the power to enforce awards. *See id.* art. 54; *see also* SCHREUER, COMMENTARY 1475. Instead, a party seeking enforcement must turn to the courts of a Contracting State. *See* ICSID Convention art. 54. A Contracting State's court must

"recognize an award rendered pursuant to [the] Convention as binding and enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that State." *Id.* art. 54(1). "[Contracting] states' courts are thus not permitted to examine an ICSID award's merits, its compliance with international law, or the ICSID tribunal's jurisdiction to render the award; under the Convention's terms, they may do no more than examine the judgment's authenticity and enforce the obligations imposed by the award." *Mobil*, 863 F.3d at 102 (citing SCHREUER, COMMENTARY 1139-41). The ICSID Convention also addresses enforcement by Contracting States with federal systems, such as the United States: "A Contracting State with a federal constitution may enforce such an award in or through its federal courts and may provide that such courts shall treat the award as if it were a final judgment of the courts of a constituent state." ICSID Convention art. 54(1).

The United States is a Contracting State. INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES, *List of Contracting States and Other Signatories of the Convention* 5 (October 25, 2022), https://icsid.worldbank.org/sites/default/files/ICSID%203/ICSID-3--ENG.pdf. Venezuela was a Contracting State but denounced its membership in 2012. *See id.* However, the terms of the bilateral investment treaty between Spain and Venezuela render Venezuela subject to ICSID's jurisdiction for the purpose of the arbitration proceedings at issue here. *See* Joint Appendix ("J.A.") 46, 90-92.

Congress gave effect to the United States's obligations under the ICSID Convention with the enactment of 22 U.S.C. § 1650a. *See* 22 U.S.C. § 1650a; *see also Medellín v. Texas*, 552 U.S. 491, 521 (2008). Under Section 1650a, district courts have exclusive jurisdiction over actions seeking to enforce

ICSID awards. *See* 22 U.S.C. § 1650a(b). Federal courts must give ICSID awards "the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States." *Id.* § 1650a(a); *Mar. Int'l*, 693 F.2d at 1103 n.14 ("ICSID arbitrations are to be enforced as judgments of sister states."). The full faith and credit provision's language mirrors that used in 28 U.S.C. § 1738, which requires federal courts to give full faith and credit to state court judgments. *See* 28 U.S.C. § 1738. It is also noteworthy that Section 1650a excludes ICSID awards from the purview of the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq*. *See* 22 U.S.C. § 1650a(a).

## B.  *The Underlying Arbitration*

As noted above, the facts of this case are straightforward and largely undisputed. Valores Mundiales, S.L., and Consorcio Andino, S.L., are Spanish shareholders of Venezuelan companies who were subject to an expropriation decree issued by the Venezuelan government. J.A. 46. On May 10, 2013, the pair commenced ICSID arbitration proceedings against Venezuela for losses relating to the decree. J.A. 47. ICSID convened an Arbitral Tribunal in accordance with ICSID Convention procedures. As part of the proceedings, the parties submitted multiple rounds of briefing and the Tribunal conducted a five-day hearing, which featured expert and fact witnesses. J.A. 49-51, 53-55. The parties also submitted post-hearing briefs. J.A. 56. At the close of the arbitration proceedings, the Tribunal issued a thorough decision that addressed the issues raised by the parties. *See* J.A. 31-199. The Arbitral Tribunal awarded Valores $430.4 million as compensation for damages and lost profits and close to another $6 million in costs. J.A. 196.

After the Arbitral Tribunal issued its decision and award, Venezuela applied to annul the award. J.A. 613, 732. An Annulment Committee was constituted and annulment proceedings began. *See* J.A. 613-14. While the annulment proceedings were pending, Venezuela reportedly experienced widespread civil unrest and the Venezuelan government underwent a regime change. *See Valores*, 2023 WL 3453633, at *3. The National Assembly ceased to recognize Nicolás Maduro as President and named Juan Guaidó as Interim President. *Id.* The United States recognized Guaidó as Venezuela's leader. *Id*. However, Maduro maintained control over key institutions and several other countries continued to recognize him as Venezuela's legitimate leader. *Id.*

Meanwhile, on January 8, 2019, Valores filed a suit in the District Court, seeking enforcement of the Tribunal's award. As relief, Valores requested enforcement of the ICSID award and the pecuniary obligations contained therein, reimbursement of its legal fees, and "such other and further relief as the Court may deem just and proper." J.A. 18.

On March 27, 2019, during the ICSID annulment proceedings, the Special Attorney General for the Guaidó government sought to intervene and replace the Maduro government's representative as Venezuela's counsel in the proceeding. J.A. 619-20. Although the parties had concluded the written phase of the annulment proceeding and a hearing date had been set, the Annulment Committee suspended the matter and requested that all parties submit briefing on the issue of Venezuela's representation. J.A. 506. Representatives for both the Guaidó and Maduro regimes and Valores complied with the Annulment Committee's request (although the Guaidó regime's representative did not submit a reply brief). J.A. 507. On August 29, 2019, the Annulment Committee issued a written opinion finding that under both international and

Venezuelan law, the Guaidó government's representative had failed to carry his burden to prove his legitimacy to represent Venezuela in the ICSID action. J.A. 517. The Annulment Committee then held a two-day hearing on the merits of Venezuela's annulment application. J.A. 736. On December 21, 2021, the Annulment Committee issued a decision affirming the Arbitral Tribunal's decision and award. J.A. 712. The Annulment Committee also granted Venezuela an additional $2.3 million in attorneys' fees and costs. *Id.*

During the prolonged annulment process, the federal litigation also progressed, albeit in fits and starts. On October 23, 2019, the Clerk of the District Court entered a default judgment against Venezuela. J.A. 4. On March 2, 2020, Venezuela's counsel entered appearances, answered the Complaint, and sought to have the default judgment set aside. *Id.* Valores moved for judgment on the pleadings or, in the alternative, summary judgment; Venezuela cross-moved for summary judgment. J.A. 5.

On November 17, 2020, after the parties had fully briefed their summary judgment motions, the District Court stayed the case, pending completion of the annulment proceeding. J.A. 6. Following the Annulment Committee's decision, the District Court lifted the stay on January 24, 2022. J.A. 6-7. After a hearing before a Magistrate Judge, the District Court granted summary judgment for Valores. *Valores Mundiales v. Bolivarian Republic of Venezuela*, 2023 WL 3453633 (D.D.C. May 15, 2023).

First, the District Court held that a federal court's review of an ICSID award was limited and that Valores's ICSID award against Venezuela was owed full faith and credit. *Id.* at *5-7. The District Court noted that the Arbitral Tribunal and the Annulment Committee had followed all relevant ICSID

procedures, that the Guaidó government was given an opportunity to present its claim to the Annulment Committee, and that the committee issued a "lengthy and reasoned" decision rejecting its arguments. *Id.* at \*6. The District Court then rejected Venezuela's claim that enforcement of an ICSID award amounted to an impermissible recognition of the Maduro regime as Venezuela's legitimate representative. *Id.* at \*7.

The District Court also held that Valores was "entitled to all fees and costs ordered by the annulment committee." *Id.* This included the additional $2.3 million in attorneys' fees and costs awarded by the Annulment Committee in December 2021, which Venezuela had sought to exclude. *Id.* The District Court rejected Venezuela's argument that Valores waived its right to such relief by submitting in a Joint Status Report that "the final decision of the ICSID Committee does not impact the Parties' positions before this Court." *See id.* The District Court noted that Venezuela took this sentence out of context, as Valores's statement referred to the merits of summary judgment briefing, not the relief requested. *See id.*

Venezuela timely appealed.

## II. ANALYSIS

### A. *Standard of Review*

We review *de novo* the District Court's grant of summary judgment and denial of a cross-motion for summary judgment. *Consumer Fed'n of Am. & Pub. Citizen v. U.S. Dep't of Health & Hum. Servs.*, 83 F.3d 1497, 1501 (D.C. Cir. 1996). We will affirm "only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Republican Nat. Comm. v. Taylor*, 299 F.3d 887, 890

(D.C. Cir. 2002); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The District Court also enforced the additional fees and costs granted to Valores by the Annulment Committee. We review for abuse of discretion the District Court's determination that Valores did not waive or forfeit its claim for the additional fees and costs. *Seed Co. Ltd. v. Westerman, Hattori, Daniels & Adrian, LLP*, 961 F.3d 1190, 1195 (D.C. Cir. 2020).

**B.   *Full Faith and Credit Review***

We first consider whether the ICSID award is owed full faith and credit. As the District Court held, both the Convention and its implementing legislation strictly limit a federal court's authority to review an ICSID award. *See* ICSID Convention art. 54(1); 22 U.S.C. § 1650a(a). The Convention treats Contracting States' courts as courts of enforcement, not review. *See* ICSID Convention art. 54(1); SCHREUER, COMMENTARY 1498-99. By design, any review of the merits of an ICSID Arbitral Tribunal's decision occurs internally. *See* ICSID Convention art. 53(1); SCHREUER, COMMENTARY 1452-54. Searching re-examination of ICSID awards by enforcement courts would be contrary to the Convention's central purpose of ensuring a neutral framework for dispute resolution. *See* SCHREUER, COMMENTARY 1454 (neutrality secured through delocalization of ICSID arbitration and independence from judicial control). The efficacy of this framework depends on the finality of ICSID Arbitral Tribunal decisions. *See Mobil*, 863 F.3d at 102 ("[T]he Convention reflects an expectation that the courts of a member nation will treat the award as final.").

Congress adopted implementing legislation consistent with the Convention's intent. Section 1650a states that "an [ICSID]

award shall be enforced" and requires federal courts to give ICSID awards "the same full faith and credit as if the award were a final judgment" of a state court. 22 U.S.C. § 1650a. The statute borrows the language of "full faith and credit" from Section 1738, which governs the enforcement of state court judgments in federal courts. *See* 28 U.S.C. § 1738. Section 1738 is instructive because it requires federal courts to "afford the same full faith and credit to state court judgments that would apply in the State's own courts." *Kremer v. Chem. Const. Corp.*, 456 U.S. 461, 463 (1982). It does not direct federal courts to review the merits of state court judgments.

Because Section 1650a borrows the language of Section 1738, we interpret Section 1650a by reference to Section 1738. *See George v. McDonough*, 142 S. Ct. 1953, 1963 (2022) ("[W]hen Congress employs a term of art, that usage itself suffices to adopt the cluster of ideas that were attached to each borrowed word in the absence of indication to the contrary.") (quotations and alteration omitted); *see also* 112 CONG. REC. 13149 (1966) ("To give full faith and credit to an arbitral award as if it were a final judgment of a court of one of the several States means that an action would have to be brought on the award in a United States District court just as an action would have to be brought in a United States District court to enforce the final judgment of a State court.") (statement of Senator J. William Fulbright). As with a party seeking to enforce a state court judgment under Section 1738, a party seeking to enforce an ICSID award must file an action in federal district court and give notice to the judgment debtor. *See Mobil*, 863 F.3d at 121. A district court tasked with enforcement must establish it has subject matter and personal jurisdiction over the matter, *id.* at 112, and authenticate the award, *id.* at 121.

Section 1650a's text mandates a federal court give an ICSID award "the same full faith and credit" it would receive

if the award were a "*final judgment*" of a state court. 22 U.S.C. § 1650a(a) (emphasis added). The Supreme Court has distinguished between the full faith and credit owed to laws and to judgments. *Baker by Thomas v. Gen. Motors Corp.*, 522 U.S. 222, 232 (1998). "Regarding judgments . . . the full faith and credit obligation is exacting." *Id*. at 233. "A final judgment in one State, if rendered by a court with adjudicatory authority over the subject matter and persons governed by the judgment, qualifies for recognition throughout the land." *Id*.

Preventing relitigation of issues already decided is the keystone of the full faith and credit obligation. "[U]ncertainty, confusion, and delay . . . necessarily accompany relitigation of the same issue." *Underwriters Nat. Assur. Co. v. N. Carolina Life & Acc. & Health Ins. Guar. Ass'n*, 455 U.S. 691, 704 (1982); *see also id*. at 704 n.9. As a result, a court may not deny a judgment full faith and credit because "it disagrees with the reasoning underlying the judgment or deems it to be wrong on the merits." *V.L. v. E.L.*, 577 U.S. 404, 407 (2016) (per curiam). Rather, the full faith and credit obligation owed final judgments "precludes any inquiry into the merits of the cause of action, the logic or consistency of the decision, or the validity of the legal principles on which the judgment is based." *Id.* (quoting *Milliken v. Meyer*, 311 U.S. 457, 462 (1940)).

Full faith and credit's bar against relitigation is unyielding. The Supreme Court has recognized want of jurisdiction as an exceptional instance in which a judgment may be denied full faith and credit. *Underwriters*, 455 U.S. at 705; *see also Baker*, 522 U.S. at 233 (recognizing lack of jurisdiction as a basis to deny full faith and credit but noting that the Supreme Court's "decisions support no roving 'public policy exception' to the full faith and credit due judgments") (emphasis omitted). However, even this exception must yield to the prohibition against relitigation. "[A] judgment is entitled to full faith and

credit—even as to questions of jurisdiction—when the second court's inquiry discloses that those questions have been fully and fairly litigated and finally decided in the court which rendered the original judgment." *Durfee v. Duke*, 375 U.S. 106, 111 (1963).

Section 1650a contains further signals that Congress did not intend federal courts to re-open the merits of ICSID awards. The statute expressly forecloses collateral attack on ICSID awards in federal courts by excluding ICSID enforcement actions from the purview of the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 *et seq*. *See* 22 U.S.C. § 1650a(a). The FAA allows an enforcing court to vacate an arbitral award where the award was tainted by fraud, corruption, or misconduct by the arbitrator. 9 U.S.C. § 10(a). By removing ICSID awards from the FAA's purview, Congress rejected the possibility that the FAA's grounds for vacatur could be applied to an ICSID award, thus reducing the scope of judicial review of ICSID awards below even the "extremely limited" review available under the FAA. *See Kurke v. Oscar Gruss & Son, Inc.*, 454 F.3d 350, 354 (D.C. Cir. 2006); *see also Mobil*, 863 F.3d at 120-21.

On the record before this court, it is clear that Valores's ICSID awards against Venezuela are owed full faith and credit. No party contests the jurisdiction of ICSID or the authenticity of the awards rendered by the Arbitral Tribunal and the Annulment Committee. *See Mobil*, 863 F.3d at 102. Following the Supreme Court's elaboration of the full faith and credit standard, we look to whether ICSID would treat the award as binding. *See Kremer*, 456 U.S. at 463. As the District Court found, it would. *See Valores*, 2023 WL 3453633, at *5. Neither the parties nor the record suggests otherwise. Based on a straightforward application of Section 1650a, the ICSID awards are enforceable against Venezuela.

Venezuela claims we should deny full faith and credit to Valores's ICSID awards against it because the Guaidó government's representatives were denied an opportunity to be heard. On Venezuela's view, an analogous state court judgment would not be owed full faith and credit for lack of procedural due process. Venezuela's position cannot withstand scrutiny under the full faith and credit standard.

Because jurisdiction is satisfied and the award's authenticity is not up for debate, Venezuela seeks to prevent enforcement by rehashing an issue that the Annulment Committee considered and resolved. However, Venezuela's attempt cannot succeed because Section 1650a prohibits relitigation of issues that have been fully considered, carefully addressed, and decided on the merits in an ICSID action. Venezuela disagrees with the committee's decision to deny the Guaidó government's request to participate in the annulment proceedings. Before this court, Venezuela essentially argues that it was deprived of procedural due process because it opposes the judgment issued by the Annulment Committee. This argument is plainly flawed. Apart from its claim that new counsel selected by the Guaidó regime should have been allowed to intervene in the annulment proceeding, Venezuela does not point to any additional procedure that the Annulment Committee should have followed to address its claims. Nor does it doubt that the Annulment Committee heard and fully addressed all of its arguments. Rather, Venezuela simply objects to the Annulment Committee's disposition of the case. The argument is meritless.

Furthermore, the Annulment Committee's denial of the Guaidó government's request to participate in the annulment proceedings is hardly a misstep that would compel this court to deny full faith and credit to the committee's judgment. Indeed,

there can be no doubt that the Guaidó government's participation was "fully and fairly" argued by the parties and "finally decided" by the Annulment Committee. *See Durfee*, 375 U.S. at 111.

Upon receipt of a letter from the Guaidó regime seeking to intervene, the Annulment Committee immediately suspended its proceedings, requested briefing from all parties, and issued an extensive opinion outlining its reasoning for declining the Guaidó regime's request. J.A. 506. The Guaidó regime was afforded a full airing and discussion of its position. The Annulment Committee concluded that the Guaidó regime's representative had not carried the burden necessary to displace Venezuela's existing counsel which had been duly appointed and had been prosecuting its annulment case since its inception. J.A. 504-18; *see also* J.A. 516-17 ¶¶ 49, 51 ("Mr. Hernández's presentation is not enough to justify a change of procedural representation in this case. . . . Therefore, the procedure must continue with the representation of the Republic already constituted in the file."). Venezuela does not deny that the Annulment Committee followed all relevant rules governing ICSID actions. Nor could it. As the District Court observed, throughout the annulment process, "the *ad hoc* committee acted in accordance with ICSID's procedural rules, allowed Venezuela to be heard, and issued opinions grounding its decisions in [Venezuelan] and international law." *Valores*, 2023 WL 3453633, at *6.

Venezuela has had its opportunity to be heard. The issue of its representation was considered and decided by the Annulment Committee in full accordance with ICSID rules. We will not allow Venezuela to re-open the issue in federal court. On the record before us, it is clear that the judgments of the ICSID Arbitral Tribunal and the Annulment Committee are entitled to full faith and credit.

## C. *Recognition*

Venezuela next attempts to skirt the well-established limits of full faith and credit review by suggesting that enforcement of the ICSID awards against Venezuela would contravene the President's Recognition authority under Article II of the Constitution. Venezuela argues that "the ICSID Convention cannot be interpreted as obligating a U.S. court to issue a decision that undermines the Executive's exclusive power to recognize foreign governments." Reply Brief for Appellant 14-15. Thus, according to Venezuela, "[t]he recognition doctrine precludes courts from recognizing any entity or individual purporting to act on behalf of the sovereign state other than the government recognized by the Executive Branch." *Id*. at 19.

This argument is clearly a non sequitur. Neither the ICSID Convention nor its implementing legislation undermines the authority of the President of the United States. And the District Court's decision in no way "recognizes" anyone purporting to act on behalf of a sovereign state.

As the District Court correctly observed, enforcement of the ICSID awards is not equivalent to recognition of the Maduro regime. In noting that the question regarding the legitimacy of the Maduro regime was not before the court, the District Court stated that,

> [I]f lawyers for the Maduro government had attempted to enter notices of appearances on behalf of Venezuela in *this* proceeding over the objection of the government that the U.S. Executive recognized, the Court would likely [have] reject[ed] those notices. But that has not happened. In enforcing the award, the Court is not

recognizing any regime as the current official government of Venezuela.

*Valores*, 2023 WL 3453633, at *7.

The District Court understood that "[r]ecognition is a 'formal acknowledgment . . . that a particular regime is the effective government of a state.'" *Zivotofsky v. Kerry*, 576 U.S. 1, 11 (2015) (quoting Restatement (Third) of Foreign Relations Law of the United States § 203 cmt. a). Recognition "is a political rather than a judicial question," *Guaranty Tr. Co. of New York v. United States*, 304 U.S. 126, 137 (1938), and is "often effected by an express written or oral declaration," *Zivotofsky*, 576 U.S. at 11 (internal quotation omitted). Neither the District Court nor this court has "recognized" any government regime in Venezuela.

Precluded by Section 1650a from examining the merits of matters decided in an ICSID award, this court expresses no opinion regarding the Annulment Committee's decision. And we certainly do not mean to say anything approaching a "formal acknowledgment" or "express . . . declaration" that the Maduro regime is the "effective government" of Venezuela. *Id.*; *see also Mobil*, 863 F.3d at 102 ("Member states' courts are . . . not permitted to examine an ICSID award's merits, its compliance with international law, or the ICSID tribunal's jurisdiction to render the award; under the Convention's terms, they may do no more than examine the judgment's authenticity and enforce the obligations imposed by the award."). This court does not stray from the President's decision to recognize Juan Guaidó as Venezuela's Interim President, a decision that is "conclusive on all domestic courts." *Guaranty Trust*, 304 U.S. at 138.

Nor does our enforcement of the ICSID awards imply a denial of the President's recognition of the Guaidó government. Our enforcement cannot seriously be seen as an attempt by this court to "aggrandiz[e] its power at the expense of another branch." *Zivotofsky,* 576 U.S. at 31-32 (alteration in original) (quoting *Freytag v. Commissioner*, 501 U.S. 868, 878 (1991)). Nothing in our enforcement of the ICSID awards forces the Executive to contradict his statements recognizing the Guaidó regime. *See Zivotofsky*, 576 U.S. at 30. Nor is there anything to indicate that Section 1650a was passed with a purpose of undermining the Executive's foreign affairs authority. *See id*. at 31. Instead, our decision simply follows the path that Congress and the Executive have jointly forged: we apply legislation Congress passed to implement a treaty the President signed and the Senate approved.

An ICSID Arbitral Tribunal and Annulment Committee are not bound by United States law. Rather, they must follow the framework set out in the ICSID Convention and the procedures adopted by ICSID pursuant to its authority under the ICSID Convention. The United States agreed to these rules when it became a Contracting State under the ICSID Convention. And, as noted above, Section 1650a prohibits federal courts from relitigating issues that have been fully considered, addressed, and decided in an ICSID action.

Venezuela looks to *United States v. Pink*, 315 U.S. 203 (1942), for support. In *Pink*, the Supreme Court considered a New York court's decision to deny effect to an agreement between the United States and Russia concerning the assignment of certain claims. The New York Court of Appeals determined that the Russian decrees upon which the assignment was based had no extraterritorial effect and that "if the decrees were given extraterritorial effect . . . their recognition would be unconstitutional and contrary to the

public policy of the United States and the State of New York." *Pink*, 315 U.S. at 214. The Supreme Court reversed.

The Court in *Pink* held that "[e]nforcement of New York's policy . . . would collide with and subtract from the Federal policy." *Id*. at 231. Such a collision was unconstitutional because, with respect to recognition, the President's authority "is not limited to a determination of the government to be recognized. It includes the power to determine the policy which is to govern the question of recognition." *Id*. at 229. As a result, the Supremacy Clause requires that "state law must yield when it is inconsistent with or impairs the policy or provisions of a treaty or of an international compact or agreement." *Id*. at 230-31.

The decision in *Pink* has no bearing on the issues before this court. Enforcement of the ICSID awards does not implicate a conflict between state and federal law. In this case, federal policy – in the form of the ICSID treaty and its implementing legislation – requires this court to enforce the awards without review of the merits, pursuant to Article 54(1) of the ICSID Convention and Section 1650a.

In our constitutional scheme, the judiciary must follow the political branches' lead on matters of foreign affairs. *See Chicago & S. Air Lines v. Waterman S. S. Corp.*, 333 U.S. 103, 111 (1948). ("[Foreign policy] decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative. . . . They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry."). Here, a refusal to enforce the ICSID awards against Venezuela would require this court to ignore the treaty obligations undertaken by the Executive and approved by the

Senate and the implementing legislation passed by Congress. Enforcement, not its opposite, is what the separation of powers requires.

## D. *Fees and Costs*

Finally, we find that the District Court did not abuse its discretion in enforcing the additional fees and costs awarded by the Annulment Committee. The District Court noted that, in claiming that Valores had forfeited their right to the fees and costs, Venezuela misconstrued the submissions in the parties' January 21, 2022 Joint Status Report. *See Valores*, 2023 WL 3453633, at *7. We agree. The record makes clear that Valores's statement that "[t]he final decision of the ICSID Committee does not impact the Parties' positions before this Court" concerned the merits of the summary judgment briefing, not the relief requested. *See* J.A. 624. Furthermore, in failing to raise this issue before the Magistrate Judge, Venezuela "waive[d] its own waiver argument." *Se. Alabama Med. Ctr. v. Sebelius*, 572 F.3d 912, 920 n.7 (D.C. Cir. 2009).

In any event, the District Court squarely considered Venezuela's argument advocating exclusion of Valores's supplementary fees and costs and found it wanting. Finding no "error of law" in the District Court's decision, we hold that the District Court did not abuse its discretion in enforcing the Annulment Committee's award of legal fees and costs to Valores. *See Oceana, Inc. v. Ross*, 920 F.3d 855, 864 (D.C. Cir. 2019).

## III. CONCLUSION

For the reasons set forth above, we affirm the judgment of the District Court.