# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued February 28, 2024        Decided May 14, 2024

No. 23-7008

IOAN MICULA, ET AL.,
APPELLEES

v.

GOVERNMENT OF ROMANIA,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:17-cv-02332)

———

*David R. Fine* argued the cause for appellant. On the briefs were *Ioana Salajanu* and *Matthew J. Weldon*.

*Stephen P. Anway* and *Dimitar P. Georgiev-Remmel* were on the brief for *amicus curiae* the European Commission in support of appellant.

*Francis A. Vasquez, Jr.* argued the cause for appellees. With him on the brief were *Hansel T. Pham*, *Jacqueline L. Chung*, *Drew Marrocco*, *Catharine Luo*, *Anthony B. Ullman*, *John J. Hay*, and *Luke A. Sobota*.

*Paul M. Levine*, *James J. East, Jr.*, and *Carlos Ramos-Mrosovsky* were on the brief for *amicus curiae* International Scholars in support of appellees.

Before: PILLARD and PAN, *Circuit Judges*, and ROGERS, *Senior Circuit Judge*.

Opinion for the Court by *Senior Circuit Judge* ROGERS.

ROGERS, *Senior Circuit Judge*:    The Government of Romania seeks relief from three judgments stemming from the confirmation of an international arbitral award on the ground that the district court lacked subject matter jurisdiction under the arbitration exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605(a)(6).  It contends that the bilateral agreement to arbitrate underlying the award is invalid under European Union ("EU") law as shown by two decisions of the EU's highest court in 2022.  The district court denied Romania's motion for relief pursuant to Federal Rule of Civil Procedure 60(b) on the grounds that EU law was inapplicable, because the dispute preceded Romania's accession to the EU in 2007 and neither EU decision on which Romania relies retroactively rendered the arbitration agreement void when it joined the EU.  For the following reasons, the court affirms the denial of the motion.

## I.

The underlying foreign arbitral award stemmed from adoption by the Government of Romania of tax incentives to encourage investment in certain economically "disfavored" regions of the country.  According to *Micula et al. v. Government of Romania*, ICSID Case No. ARB/05/20, Award ¶ 145 (Dec. 11, 2013) ("Arbitral Award"), the Micula brothers and associated entities (hereinafter, "Miculas") built food production facilities in Romania relying on these incentives,

which Romania stated would remain in place until at least 2009. *See id.* ¶¶ 133, 145, 152, 156, 166–72, 677, 686, 689. After Romania repealed most of the tax incentives in February 2005 in preparation to join the EU, *see id.* ¶¶ 132, 234–39, 244, the Miculas filed for arbitration in July 2005 under the rules of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, March 18, 1965, 17 U.S.T. 1270, 575 U.N.T.S. 159 ("ICSID"). As Swedish nationals, the Miculas invoked arbitral jurisdiction pursuant to a 2002 bilateral investment treaty between Romania and EU member Sweden ("Sweden-Romania BIT"). Arbitral Award ¶¶ 1, 226, 247. Article 7 of the treaty provides for ICSID international arbitration of investment disputes.

In December 2013, an ICSID tribunal awarded the Miculas 376,433,229 Romanian Lei in damages, plus interest, for breach of the Sweden-Romania BIT. Arbitral Award ¶ 1329. Applying the Sweden-Romania BIT, *id.* ¶¶ 288, 318, the tribunal ruled that EU law did not govern the dispute because although Romania joined the EU in 2007 during the pendency of the arbitral proceedings, it was not part of the EU and "not properly subject to EU law" during the events underlying the dispute. *Id.* ¶¶ 319, 340. Romania petitioned unsuccessfully in 2014 to annul the award as inconsistent with EU law.

In March 2015, while the annulment petition was pending, the European Commission determined that Romania's satisfaction of the award as an EU member would constitute anticompetitive "state aid" under EU law, and forbid Romania from paying the award. The Miculas sought review in the General Court of the Court of Justice of the European Union ("General Court"), a constituent court of the Court of Justice of the European Union ("CJEU"), the EU's highest court. In June 2019, the General Court invalidated the Commission decision, ruling that because the award compensated the Miculas for Romania's pre-EU conduct, the Commission lacked the

"competence" to review whether paying it would constitute state aid. *Eur. Food S.A. v. Eur. Comm'n*, Nos. T-624/15, T-694/15, T-704/15 (18 June 2019) ("*2019 General Court*") ¶¶ 66–67, 74–75, 79–80, 90–95.  Romania appealed in August 2019 to the CJEU.

Meanwhile, in November 2017, the Miculas petitioned the United States District Court for the District of Columbia to enforce the award pursuant to 22 U.S.C. § 1650a.[1]  The district court confirmed the award in September 2019 and entered judgment for $356,439,727, net of payments made and with interest. *Micula v. Government of Romania*, 404 F. Supp. 3d 265, 270, 285 (D.D.C. 2019) ("*2019 Confirmation*"). The district court exercised jurisdiction pursuant to the FSIA's exception to sovereign immunity for proceedings to "confirm an award made pursuant to [] an agreement to arbitrate," 28 U.S.C. § 1605(a)(6). Romania challenged subject matter jurisdiction, arguing that the arbitration clause in the Sweden-

---

[1]  22 U.S.C. § 1650a:

**§ 1650a.  Arbitration awards under the Convention**

**(a) Treaty rights; enforcement; full faith and credit; nonapplication of Federal Arbitration Act**

An award of an arbitral tribunal rendered pursuant to chapter IV of the convention shall create a right arising under a treaty of the United States.  The pecuniary obligations imposed by such an award shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States.  The Federal Arbitration Act (9 U.S.C. 1 et seq.) shall not apply to enforcement of awards rendered pursuant to the convention.

Romania BIT was void as of Romania's 2007 accession because EU law prohibits intra-EU agreements to arbitrate EU law disputes between a member state and the citizens of another member state. The district court ruled EU law was inapplicable because the parties' dispute predated Romania's EU membership and the award did not "relate to the interpretation or application of EU law." *2019 Confirmation*, 404 F. Supp. 3d at 279–80.

This court affirmed. *Micula v. Government of Romania*, 805 F. App'x 1 (D.C. Cir. 2020) ("*Micula I*"). On appeal, Romania conceded jurisdiction, *see* Br. of Resp't-Appellant, *Micula v. Government of Romania*, No. 19-7127 at 1, while the European Commission continued to argue that EU law voided Romania's agreement to arbitrate, *see* Br. of *Amicus Curiae* European Commission, *Micula v. Government of Romania*, No. 19-7127 at 7–11. The court held that, "[a]s Romania now agrees, the district court properly invoked the [FSIA] exception for actions to enforce arbitration awards." *Micula I*, 805 F. App'x at 1. Regarding the Commission's jurisdictional arguments, the court observed that, "as the district court carefully explained, Romania did not join the EU until after the underlying events here, so the arbitration agreement applied" regardless of Romania's subsequent accession to the EU. *Id.* Later proceedings led to judgments for discovery sanctions and accrued sanctions that this court affirmed. *See Micula v. Government of Romania,* No. 20-7116, 2022 WL 2281645 (D.C. Cir. Jun. 24, 2022); *Micula v. Government of Romania*, No. 21-7139, 2023 WL 2127741 (D.C. Cir. Feb. 21, 2023).

In March 2022, Romania sought relief from the *2019 Confirmation* , and ensuing sanctions, pursuant to Clauses (4), (5), and (6) of Federal Rule of Civil Procedure 60(b), arguing that two decisions of the EU's highest court in 2022 held, "[i]n unequivocal terms," that "the agreement to arbitrate in the [Sweden-Romania] BIT was void the moment that Romania

entered the EU." Romania's Mem. of Supp. of Mot. for Relief from Judg. (Mar. 29, 2022) at 5. As relevant, in January 2022, the CJEU overturned the *2019 General Court* decision and held that the European Commission was "competent" to evaluate whether Romania's post-accession payment of the award would constitute prohibited "state aid." *Eur. Comm'n v. Eur. Food S.A.*, ECLI:EU:C:2022:50 (25 Jan. 2022) ("*January 2022 CJEU*"). In September 2022, the CJEU held that because the Commission has determined satisfying the award would be state aid, EU courts cannot enforce it. *Romanian Air Traffic Serv. Admin. v. Eur. Food S.A.*, ECLI:EU:C:2022:749 (21 Sep. 2022) ("*September 2022 CJEU*"). The district court denied the Rule 60(b) motion, concluding that the CJEU Decisions did not hold Romania's accession retroactively voided its pre-EU consent to arbitrate and "the jurisdictional fact . . . that there was a valid agreement to arbitrate before Romania acceded to the EU — remains undisturbed." *Micula v. Romania*, Mem. Op. at 12–15 (D.D.C. Dec. 22, 2022) ("*2022 Mem. Op.*"), 2022 WL 18356669, at \*7; Order (Dec. 22, 2022). Romania appeals.

## II.

Romania contends, as it did in the district court, that the district court erred in denying relief under Rule 60(b)(4), (b)(5), and (b)(6), and on appeal invokes the principle of international comity. Its brief does not distinguish between the three district court judgments and appears to reason that if the court sets aside the *2019 Confirmation*, then the sanctions in 2020 and 2021 to enforce earlier confirmation should also be set aside. Inasmuch as the Miculas also do not draw a distinction between the judgments, the court will address only whether the district court erred in denying relief from the *2019 Confirmation*. Rule 60(b) proceedings are "subject to only limited and deferential appellate review." *Gonzalez v. Crosby*, 545 U.S. 524, 535 (2005) (citation omitted). Romania fails to meet its burden to show error by the district court.

**A.**

Rule 60(b)(4) provides for relief when a judgment is "void." FED R. CIV. P. 60(b)(4). A judgment is "not void . . . simply because it is or may have been erroneous." *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 270 (2010). Where a jurisdictional defect is alleged, relief is usually reserved "only for the exceptional case in which the court that rendered judgment lacked even an arguable basis for jurisdiction." *Id.* at 271 (internal quotations omitted). Appellate review of a district court's "arguable basis" ruling is *de novo*. *Lee Mem'l Hosp. v. Becerra*, 10 F.4th 859, 863 (D.C. Cir. 2021).

Romania maintains that the district court erred in applying the "arguable basis" standard because *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1182 (D.C. Cir. 2013), "strongly suggests that *de novo* review is appropriate any time a foreign sovereign contends that jurisdiction under the FSIA is lacking." Appellant's Br. 40. *Bell Helicopter* applied *de novo* review where the defendant sovereign's failure to appear resulted in entry of a default judgment, so limiting the scope of review "would create a high risk for parties who choose not to appear" based on the view that the court lacks jurisdiction. *Bell Helicopter*, 734 F.3d at 1181–82; *see Lee Mem'l Hosp.*, 10 F.4th at 864. By contrast, Romania appeared in the 2019 confirmation proceedings and contested subject matter jurisdiction. On appeal, it conceded jurisdiction under the FSIA. *See Micula I*, 805 F. App'x at 1. "Because the considerations that led [the court] away from the arguable basis standard in the circumstances of *Bell Helicopter* are absent here," the arguable basis standard properly applies. *Lee Mem'l Hosp.*, 10 F.4th at 864 (citing *Espinosa*, 559 U.S. at 271 (internal quotations omitted)).

Romania further maintains that even so there is no arguable basis for jurisdiction because the "sole basis" for the district court's determination that jurisdiction existed under the FSIA was an erroneous "interpretation and application of EU law." Appellant's Br. 44–45. In fact, the district court's jurisdictional analysis in 2019 was not premised on the "interpretation and application of EU law." Rather, the district court independently found the requisite "jurisdictional fact[]" under the arbitration exception of an agreement to arbitrate with the Miculas, *LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871, 877 (D.C. Cir. 2021), through the 2002 Sweden-Romania BIT and the Miculas' 2005 request for arbitration. *2019 Confirmation*, 404 F. Supp. 3d at 279–80. As this court later observed, *Micula I*, 805 F. App'x at 1, the district court in 2019 based that finding on careful examination of the underlying arbitral award — to which it was obligated to give "full faith and credit," 22 U.S.C. § 1650a(a) — and the text of the Sweden-Romania BIT. Likewise, the district court based its conclusion that the award did not "relate to the interpretation or application of EU law" on a "close inspection" of the award, which stated that the source of substantive law was the Sweden-Romania BIT, and that EU law did not apply because the dispute predated Romania's EU membership. *2019 Confirmation*, 404 F. Supp. 3d at 279–80 (quoting Arbitral Award ¶¶ 288, 318–19).

Furthermore, the 2022 CJEU decisions on which Romania relies do not support the interpretation that its 2007 accession to the EU retroactively rendered the preexisting agreement to arbitrate with Swedish investors "*void ab initio*." Appellant's Br. 45. The *January 2022 CJEU* decision addressed the European Commission's authority under EU law to examine whether Romania's payment of the award as a current member of the EU might constitute impermissible state aid. *January 2022 CJEU* ¶¶ 123–27. The decision does not implicitly, much less "indisputably" rule, Appellant's Br. 45, on the retroactive

validity of an agreement to arbitrate pre-dating Romania's accession. The relevant passage in that decision states that the "effect [of] Romania's accession to the European Union" was that Romania's "consent [to arbitrate] . . . from that time onwards, lacked any force." *January 2022 CJEU* ¶ 145. The *September 2022 CJEU* decision similarly states that Romania's consent to arbitrate became void "from Romania's accession to the European Union." *September 2022 CJEU* ¶¶ 38–42.

The *January 2022 CJEU* decision did conclude, for the purposes of deciding whether the Commission was competent to review Romania's post-accession payment of the award, that the relevant damages period extended beyond 2007. *January 2022 CJEU* ¶ 140. But under the FSIA arbitration exception, the relevant jurisdictional question is the existence of a valid agreement to arbitrate. *See Stileks*, 985 F.3d at 877. The extent of the damages period does not affect "the jurisdictional fact that, at the time [the Miculas] filed for arbitration, Romania had agreed to arbitrate under the Sweden-Romania BIT." *2022 Mem. Op.* at 19, 2022 WL 18356669, at *9.

**B.**

Rule 60(b)(5) provides relief from certain judgments, including a judgment "based on an earlier judgment that has been reversed or vacated" or where "applying it prospectively is no longer equitable." FED. R. CIV. P. 60(b)(5). Romania maintains the district court judgments are based on a judgment of the General Court that the CJEU reversed or vacated. In *Twelve John Does v. District of Columbia*, 841 F.2d 1133, 1138 (D.C. Cir. 1988), this court reviewed the district court's denial of a Rule 60(b)(5) motion for abuse of discretion under the "no longer equitable" clause. But the court does not appear to have established the standard of review for the "reversed or vacated" clause, and it does not always apply an abuse of discretion standard for Rule 60(b) motions, as for Rule 60(b)(4) motions

where the court has applied a *de novo* a standard of review, *see Combs v. Nick Gurtin Trucking*, 825 F.2d 437, 441 (D.C. Cir. 1987). The parties assert that the abuse of discretion standard applies to Rule 60(b)(5) motions, *see* Appellant's Br. 30; Appellee's Br. 19, and absent briefing the court will assume, without deciding, that it does.

The district court's subject matter jurisdiction, contrary to Romania's view, did not "depend" on the *2019 General Court* decision. Appellant's Br. 46. The district court rejected Romania's invocation of EU law upon independently finding that this dispute predated Romania's EU membership and did not interpret or apply EU law. *2019 Confirmation*, 404 F. Supp. 3d at 279–80. Again, the district court based those conclusions on its "close inspection" of the arbitral award and the Sweden-Romania BIT, *id.*, and its analysis did not discuss the *2019 General Court* decision. Instead, the district court stated that its subsequent discussion of the *2019 General Court* decision served to "confirm[]," *id.* at 280, its conclusion that the arbitral tribunal did not apply EU law, *2022 Mem. Op.* at 15–17, 2022 WL 18356669, at \*8.

For the first time on appeal, Romania maintains that the 2022 CJEU decisions invalidated the underlying award itself. Appellant's Br. 49–50. "It is well settled that issues and legal theories not asserted at the District Court level ordinarily will not be heard on appeal." *District of Columbia v. Air Fla., Inc.*, 750 F.2d 1077, 1084 (D.C. Cir. 1984). Romania offers no explanation for its failure to do so. *See id.* In any event, on appeal Romania cites no text from either 2022 CJEU decision suggesting that court purported to invalidate the underlying arbitral award. Under the ICSID Convention, the "only route for setting aside an ICSID Arbitral Tribunal's award is through the . . . annulment process," which Romania unsuccessfully pursued. *Valores Mundiales, S.L. v. Bolivarian Republic of Venezuela,* 87 F.4th 510, 515 (D.C. Cir. 2023). Signatory

nation courts must "recognize an award rendered pursuant to the Convention as binding" and are "not permitted to examine an ICSID award's merits." *Id.* (quotations and citations omitted).

## C.

Rule 60(b)(6) provides relief from a judgment for "any other reason that justifies relief." FED. R. CIV. P. 60(b)(6). The clause applies where a movant can demonstrate "extraordinary circumstances," *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864 (1988), and "should be only sparingly used," *Salazar ex rel. Salazar v. District of Columbia*, 633 F.3d 1110, 1120 (D.C. Cir. 2011) (quoting *Kramer v. Gates*, 481 F.3d 788, 792 (D.C. Cir. 2007)). Because Rule 60(b) clauses are "mutually exclusive," relief under (b)(6) may not be "premised on one of the grounds for relief enumerated in clauses (b)(1) through (b)(5)." *Salazar*, 633 F.3d at 1116 (first quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 393 (1993); then quoting *Liljeberg*, 486 U.S. at 863). The court reviews the district court's denial of Rule 60(b)(6) relief for abuse of discretion. *Id.* at 1114–15.

Romania interprets the 2022 CJEU decisions to represent a "change in controlling law **and** in circumstance" insofar as they establish that there "has never been a valid agreement to arbitrate." Appellant's Br. 53–54 (emphasis in original). But, as the district court concluded, Romania's attempt to obtain relief pursuant to Clause (b)(6) repackages arguments made in seeking relief pursuant to Rule 60(b)(4) and (b)(5), and is therefore barred. *See 2022 Mem. Op.* at 19, 2022 WL 18356669, at *9.

Romania also invokes the principle of international comity. Appellant's Br. 59–62. As Romania specifies no clause of Rule 60(b), the court construes it to seek relief under

Clause (b)(6) and considers whether the asserted comity concerns rise to the level of an extraordinary circumstance. "'Comity' summarizes in a brief word a complex and elusive concept — the degree of deference that a domestic forum must pay to the act of a foreign government not otherwise binding on the forum." *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (D.C. Cir. 1984). Neither a "matter of absolute obligation" nor of "mere courtesy and good will," *Hilton v. Guyot*, 159 U.S. 113, 163–64 (1895), the "obligation of comity expires" when it is in conflict with "the strong public policies of the forum." *Laker Airways*, 731 F.2d at 937–38.

Here, Romania maintains that the district court ignored the effect of the 2022 CJEU decisions and failed to take due account of the incompatibility between Romania's EU obligations and the district court's confirmation of the award. Appellant's Br. 48, 59–60. The district court carefully examined the two CJEU decisions prior to concluding that they did not affect its jurisdiction under the FSIA. *2022 Mem. Op.* at 6–7, 13–15, 2022 WL 18356669, at *3–4, *7. Essentially, Romania urges the court to ignore that Congress enacted a "comprehensive set of legal standards" in the FSIA that "indisputably govern[]" sovereign immunity, so that "any sort of immunity defense made by a foreign sovereign in an American court must stand on the Act's text. Or it must fall." *Republic of Argentina v. NML Cap., Ltd.*, 573 U.S. 134, 141–42 (2014) (quotations and citations omitted). Similarly, Congress enacted Section 1650a, *supra* note 1, to give effect to the United States' treaty obligations under the ICSID Convention, requiring U.S. courts to give "full faith and credit" to ICSID awards. *See Medellín v. Texas*, 552 U.S. 491, 521–22 (2008). The district court exercised jurisdiction under the FSIA arbitration exception, and it was obligated by Section 1650a to enforce the Miculas' valid ICSID award. *2019 Confirmation*, 404 F. Supp. 3d at 275–80. In so doing, the court

did not abuse its discretion.  *Accord Usoyan v. Republic of Turkey*, 6 F.4th 31, 49 (D.C. Cir. 2021).

Accordingly, the court affirms the district court's denial of Romania's Rule 60(b) motion for relief from judgment.